2013 VT 92

## State of Vermont v. David Button

[86 A.3d 1001]

No. 12-270

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed October 4, 2013

*Heather J. Brochu*, Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Adrienne Shea*, Law Clerk, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** This case asks us to decide whether a motor-vehicle stop was justified by the community caretaking doctrine. Defendant David Button contends that it was not and argues that the trial court erroneously denied his motion to suppress the evidentiary fruits of the stop. We reverse.

¶ 2. The trial court found the following facts, which defendant does not dispute. Shortly before midnight on November 19, 2011, defendant was driving west along Perley Road, a gravel country road in a scarcely populated area of Berkshire. At approximately 11:28 p.m., Trooper Jay Riggen was traveling east along the same road and saw defendant's approaching vehicle. Defendant was not

speeding or driving erratically, and his vehicle did not display any equipment defects or violations. The trooper decided to turn his cruiser around and follow defendant for a while.

¶ 3. The trooper followed defendant's car for some distance, all the while observing no speeding, erratic driving, equipment defects, or other violations involving either the vehicle or its operation. Eventually, defendant pulled his car to the right side of the road and stopped with the engine and lights on. Perley Road does not have a shoulder or breakdown lane, and defendant's car remained within the traveled portion of the road. The car did not block the visibility of oncoming traffic and would not have affected eastbound traffic; westbound traffic would have had to briefly cross into the eastbound lane in order to get around the car. There was very little traffic on the road that night, and defendant and the trooper encountered no other travelers during the stop.

¶ 4. There were no businesses, homes, or other structures in the area that would explain why defendant stopped his car there. The trooper, who had been following at a distance of two or three car-lengths behind the car, also pulled over and stopped. The trooper then waited to see what the car or its driver would do next, but nothing immediate happened. The operator did not get out of the car, turn on the car's emergency lights, signal for the trooper to pass, ask for help, or take any other observable action. The officer did not observe any sign that the car was disabled, such as smoke coming from the car.

¶ 5. After about thirty seconds, the trooper decided to turn on his blue lights. He testified that he thought it was "unusual" for the car to stop where it did, and decided that he should approach defendant's car to make sure defendant was "alright." While speaking with defendant, the trooper made observations that eventually led to defendant's arrest for suspected driving under the influence in violation of 23 V.S.A. § 1201(a)(2).

¶ 6. Defendant filed a motion to suppress, arguing that the warrantless stop of his vehicle violated his rights under the U.S. and Vermont Constitutions. Specifically, he argued that the officer activated his blue lights and thereby seized defendant without reasonable suspicion of a violation. In response, the State did not rely on reasonable suspicion of unlawful activity, but instead argued that the stop was justified on the basis of the "community caretaking doctrine." After thoughtfully considering our precedents in this realm, the court agreed and denied defendant's motion to

suppress. Defendant subsequently entered a conditional guilty plea to the charge of driving under the influence third offense.

¶ 7. Defendant now appeals, contending that the trial court erred in denying his motion to suppress. Specifically, defendant argues that the community caretaking doctrine does not justify the stop because the objective facts, as observed by the trooper, were insufficient to support a reasonable belief that defendant needed help.

¶ 8. "On appeal of a motion to suppress, we review the trial court's legal conclusions de novo and its factual findings for clear error." *State v. Paro*, 2012 VT 53, ¶ 2, 192 Vt. 619, 54 A.3d 516 (mem.). Because the defendant challenges only the trial court's legal conclusions regarding the applicability of the community caretaking doctrine, our review is de novo. See *id.*

¶ 9. ▮ ▮ The State does not argue that the trooper's actions — driving behind defendant, pulling over behind him, activating blue lights and approaching defendant's car — did not amount to a seizure. See *State v. Burgess*, 163 Vt. 259, 261, 657 A.2d 202, 203 (1995). The Vermont and U.S. Constitutions generally require that police have, at a minimum, reasonable suspicion that criminal activity is afoot before they seize someone. *State v. Edwards*, 2008 VT 23, ¶ 4, 183 Vt. 584, 945 A.2d 915 (mem.). However, in recognition of the fact that one of the essential roles of police officers is to enhance public safety by assisting those in distress, courts have recognized a "community caretaking" basis for a lawful warrantless seizure. *State v. Marcello*, 157 Vt. 657, 658, 599 A.2d 357, 358 (1991) (mem.). The propriety of a traffic stop based on the community caretaking doctrine turns on "whether there were specific and articulable facts objectively leading the officer to reasonably believe that the defendant was in distress or needed assistance, or reasonably prompted an inquiry in that regard." *Edwards*, 2008 VT 23, ¶ 8; see also *State v. St. Martin*, 2007 VT 20, ¶ 6, 181 Vt. 581, 925 A.2d 999 (mem.) (vehicle stops are proper under community caretaking doctrine when officer can particularly describe "a perceived emergency or [an] indication of imminent threat to specific individuals" before effectuating stop). The key to the constitutional permissibility of such police action is reasonableness, *Marcello*, 157 Vt. at 658, 599 A.2d at 358. Community caretaking functions may be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

¶ 10. The present case is a close one. It is unlike our earlier community caretaking stop cases in which the defendant or a third party expressly communicated to an officer a message suggesting that someone was in distress. See *State v. Campbell*, 173 Vt. 575, 576, 789 A.2d 926, 928 (2001) (mem.) (holding that defendant's act of flashing high beams at marked police cruiser while defendant was parked by information booth on particularly stormy night provided reasonable basis to believe that people in car were seeking assistance); *Marcello*, 157 Vt. at 657-58, 599 A.2d at 358 (affirming trial court's decision that officer was reasonable in his belief that defendant needed aid when another motorist informed officer that there was "something wrong" with defendant).

¶ 11. ■ Nor is it clearly decided by our prior cases involving police seizures of individuals in cars parked on the roadside or in designated lots. We have held that where a car was pulled over in an abnormal and unsafe location — barely off the travel lane of the highway, late at night, and near a curve "such that it presented a potential hazard to other motorists negotiating the curve in the dark," the officer did have reasonable grounds to believe the driver needed help. *Edwards*, 2008 VT 23, ¶¶ 6-7; see also *State v. Theetge*, 171 Vt. 167, 171, 759 A.2d 496, 499 (2000) (holding stop of driver pulled over in breakdown lane of interstate highway was justified because driver either violated law prohibiting parking in breakdown lane in absence of emergency or had an emergency).

¶ 12. On the other hand, in *State v. Jestice*, we held that the fact that a car was parked at nighttime in a relatively busy lot by a trailhead near a state highway that was regularly patrolled by police was not sufficient to support a seizure predicated on the community caretaking doctrine. 2004 VT 65, ¶ 10, 177 Vt. 513, 861 A.2d 1060 (mem.). Similarly, in *Burgess*, we concluded that where a car was idling in a lawful pull-off by the side of the road, with no indication that the car was disabled or anyone was ill or otherwise in distress, police could not seize the individuals in the car on the basis of a community caretaking rationale. 163 Vt. at 262, 657 A.2d at 203-04. In the absence of any specific indicia of distress, and given that the cars in these cases were safely and lawfully parked in places designated for such parking, and at times and locations that did not suggest distress, law enforcement's concern for the well-being of the occupants was not sufficient to justify the intrusion of a seizure.

¶ 13. On balance, we conclude that the objective facts here did not provide sufficient grounds to believe that defendant was in distress to warrant the trooper's seizure. As the trial court noted, defendant's car was stopped with its engine running on the shoulder of a back-country road, where it posed no danger to oncoming traffic. Defendant had not been driving erratically or breaking any traffic laws. The court explicitly stated that "[i]f those were the only relevant facts in this case, [the] Court would grant the defendant's [motion]."

¶ 14. Nevertheless, the trial court relied on other facts, including the fact that the officer had been following the car when defendant pulled over, and that defendant did not get out of the car, make a call, or undertake any other actions after pulling over. Given these circumstances, the court held that a police officer could reasonably suspect that defendant "might be suffering a heart attack or other serious problem, causing him to stop unexpectedly in a remote location." Under our standard, these facts are not enough to support an inference that defendant could be in distress.

¶ 15. ■■■ "[S]pecific and articulable facts," not conclusory speculations, are required to support a traffic stop under the community caretaking exception. *Marcello*, 157 Vt. at 658, 599 A.2d at 358. Here, at no time did defendant (or any other occupant of the car) signal distress to the officer. The trooper's sole bases for stopping defendant were that (1) defendant pulled over to the side of the road, and (2) defendant sat there for 30 seconds. Although, superficially, the facts of this case may resemble those in *Edwards*, 2008 VT 23 — a case in which the presence of a car pulled over in a dangerous position on the road was itself a sufficient ground for conducting a community caretaking stop — there are important distinctions between the cases.

¶ 16. First and foremost, the trooper here did not just happen upon defendant's car pulled over on the roadway as did the officer in *Edwards*. Here, the trooper passed defendant on the road and decided to turn around and follow defendant's car in order to, as the trooper himself testified, "see if there was anything going on with the vehicle." The trooper saw that all of the various lights on defendant's car were operating properly, and that defendant's car was running fine. From the time the trooper first saw the defendant until he activated his blue lights after turning around

and following defendant for a period, he did not see defendant speed or otherwise drive unsafely. The trooper did not see defendant commit any traffic violations. Only after defendant pulled over and then took no further observable action did the trooper's acknowledged motor-vehicle enforcement activity morph into a community caretaking endeavor. The trooper's knowledge of the events leading up to defendant's pulling over to the side of the road provided much greater context to the trooper than that available to the law enforcement officer in *Edwards*. Given that defendant had shown no signs of distress while the trooper observed his driving, and that defendant only pulled over to the side of the road after the trooper passed him, turned around, caught up to him, and followed him from a distance of several car lengths, the reasonableness of the trooper's inference that defendant needed the trooper's help was far weaker than in *Edwards*. Because he decided to closely follow the defendant, the trooper had a chance to observe that defendant was driving safely, suggesting that defendant was not in distress.

¶ 17. Second, the trial court here expressly found that the car did not block the visibility of oncoming traffic, that eastbound traffic would not have been affected by the car, and that westbound traffic could pass the car by briefly crossing into the eastbound lane. In contrast, in *Edwards* we emphasized that the location of defendant's car was "abnormal and unsafe," and that the car posed a potential hazard to other motorists traveling around the nearby curve in the dark. 2008 VT 23, ¶ 6. Both the objective indicia of distress — pulling over in an unsafe place — and the danger to other drivers that were significant factors in *Edwards* are absent here.

¶ 18. ▮ In sum, the trial court recognized that defendant's act of pulling to the side of the road and stopping with his engine and lights on did not alone provide a reasonable basis for the officer to believe that the operator needed help, but concluded that the fact that defendant then simply did nothing for thirty seconds after pulling over did provide such basis. We respectfully disagree. If a driver's pulling over and waiting patiently could, by itself, trigger a community caretaking stop under the circumstances of this case, it is hard to imagine what a law-abiding driver who does not want to be followed closely by another car on a remote road at night could do to avoid both the headlights in the mirror and the intrusion of a seizure.

¶ 19. ▇ We all rely on law enforcement officers to promote public safety through means other than the detection and investigation of crimes, and we do not mean to unduly restrict the ability of police officers to offer help to people who appear to need it. It is important to respect law enforcement officers' judgment in their exercise of the community caretaking function. See *Marcello*, 157 Vt. at 658, 599 A.2d at 358 ("[P]olice have an essential role as public servants to assist those in distress and to maintain and foster public safety." (quotation omitted)). Nevertheless, there must be an "objective indication that caretaking was required." *Burgess*, 163 Vt. at 262, 657 A.2d at 204. Had defendant indicated that he needed help, or parked in a precarious location, this might be a different case. The facts here, however, demonstrate no such "objective indication" that caretaking was required. *Id.*

¶ 20. ▇ Moreover, when a law enforcement officer's offer of help takes the form of a constitutional seizure, the intrusion, however well-intentioned, must satisfy constitutional requirements. We have noted the danger that an expansive community caretaking doctrine presents to individuals' right to privacy and must take care not to allow the exception to "devour the requirement of reasonable articulable suspicion." *Id.* at 262, 657 A.2d at 204. In this case, the trooper could have taken steps short of a traffic stop — such as slowly driving by defendant's car while looking through the driver's window — to see whether defendant needed help. Instead, he activated his blue lights and restrained defendant's liberty. If a police officer wants to check on someone who may be in distress, there are usually ways to do so short of a seizure. For the reasons set forth above, the trooper did not have a sufficient basis to reasonably believe that defendant was in distress or experiencing an emergency.[*]

*Reversed.*

---

[*] We do not consider whether the seizure was warranted on the basis of any traffic violations arising from defendant's stopping his car in the traveled portion of the road. The State did not argue below or on appeal that the officer's actions were warranted on the basis of a reasonable suspicion of a traffic violation.