2013 VT 92



State v. Button (2012-270)

 

2013 VT 92

 

[Filed 04-Oct-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 92
 
  


 No. 2012-270
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Franklin Unit,
 
 
  
 
 
 Criminal Division
 
 
  
 
 
  
 
 
 David Button
 
 
 May Term, 2013
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Robert
 A. Mello, J.
 
 
  
 
 Heather J. Brochu, Franklin County
Deputy State’s Attorney, St. Albans, for Plaintiff-Appellee.

 

Matthew F. Valerio, Defender General, Anna Saxman, Deputy Defender General, and 

  Adrienne Shea, Law Clerk, Montpelier, for
Defendant-Appellant.

 

 

PRESENT:  Reiber, C.J.,
Dooley, Skoglund, Burgess and Robinson, JJ.

 

 

¶ 1.            
ROBINSON, J.   This case asks us to decide whether a
motor-vehicle stop was justified by the community caretaking doctrine.
 Defendant David Button contends that it was not and argues that the trial
court erroneously denied his motion to suppress the evidentiary fruits of the
stop.  We reverse.

¶ 2.            
The trial court found the following facts, which defendant does not
dispute.  Shortly before midnight on November 19, 2011, defendant was
driving west along Perley Road, a gravel country road
in a scarcely populated area of Berkshire.  At approximately 11:28 p.m.,
Trooper Jay Riggen was traveling east along the same
road and saw defendant’s approaching vehicle.  Defendant was not speeding
or driving erratically, and his vehicle did not display any equipment defects
or violations.  The trooper decided to turn his
cruiser around and follow defendant for a while. 

¶ 3.            
The trooper followed defendant’s car for some distance, all the while
observing no speeding, erratic driving, equipment defects, or other violations
involving either the vehicle or its operation.  Eventually, defendant
pulled his car to the right side of the road and stopped with the engine and
lights on.  Perley Road does not have a shoulder
or breakdown lane, and defendant’s car remained within the traveled portion of
the road.  The car did not block the visibility of oncoming traffic and
would not have affected eastbound traffic; westbound traffic would have had to
briefly cross into the eastbound lane in order to get around the car.
 There was very little traffic on the road that night, and defendant and
the trooper encountered no other travelers during the stop.

¶ 4.            
There were no businesses, homes, or other structures in the area that
would explain why defendant stopped his car there.  The trooper, who had
been following at a distance of two or three car-lengths behind the car, also
pulled over and stopped.  The trooper then waited to see what the car or
its driver would do next, but nothing immediate happened.  The operator
did not get out of the car, turn on the car’s emergency lights, signal for the
trooper to pass, ask for help, or take any other observable action.  The officer
did not observe any sign that the car was disabled, such as smoke coming from
the car.

¶ 5.            
After about thirty seconds, the trooper decided to turn on his blue
lights.  He testified that he thought it was “unusual” for the car to stop
where it did, and decided that he should approach defendant’s car to make sure
defendant was “alright.”  While speaking with defendant, the trooper made
observations that eventually led to defendant’s arrest for suspected driving
under the influence in violation of 23 V.S.A. § 1201(a)(2). 

¶ 6.            
Defendant filed a motion to suppress, arguing that the warrantless stop
of his vehicle violated his rights under the U.S. and Vermont
Constitutions.  Specifically, he argued that the officer activated his
blue lights and thereby seized defendant without reasonable suspicion of a
violation.  In response, the State did not rely on reasonable suspicion of
unlawful activity, but instead argued that the stop was justified on the basis
of the “community caretaking doctrine.”  After thoughtfully considering
our precedents in this realm, the court agreed and denied defendant’s motion to
suppress.  Defendant subsequently entered a conditional guilty plea to the
charge of driving under the influence third offense.

¶ 7.            
Defendant now appeals, contending that the trial court erred in denying
his motion to suppress.  Specifically, defendant argues that the community
caretaking doctrine does not justify the stop because the objective facts, as
observed by the trooper, were insufficient to support a reasonable belief that
defendant needed help. 

¶ 8.            
“On appeal of a motion to suppress, we review the trial court’s legal
conclusions de novo and its factual findings for clear error.”  State
v. Paro, 2012 VT 53, ¶ 2, ___ Vt. ___, 54 A.3d 516.  Because the defendant challenges only the
trial court’s legal conclusions regarding the
applicability of the community caretaking doctrine, our review is de novo.
 See id. 

¶ 9.            
The State does not argue that the trooper’s actions—driving behind
defendant, pulling over behind him, activating blue lights and approaching
defendant’s car—did not amount to a seizure.  See State
v. Burgess, 163 Vt. 259, 261, 657 A.2d 202, 203 (1995).  The
Vermont and U.S. Constitutions generally require that police have, at a
minimum, reasonable suspicion that criminal activity is afoot before they seize
someone.  State v. Edwards, 2008 VT 23, ¶ 4, 183
Vt. 584, 945 A.2d 915 (mem.).  However,
in recognition of the fact that one of the essential roles of police officers
is to enhance public safety by assisting those in distress, courts have
recognized a “community caretaking” basis for a lawful warrantless seizure.
 State v. Marcello, 157 Vt. 657, 658, 599 A.2d
357, 358 (1991) (mem.).  The propriety of
a traffic stop based on the community caretaking doctrine turns on “whether
there were specific and articulable facts objectively leading the officer to
reasonably believe that the defendant was in distress or needed assistance, or
reasonably prompted an inquiry in that regard.”  Edwards, 2008 VT
23, ¶ 8; see also State v. St. Martin, 2007 VT 20, ¶ 6, 181 Vt. 581, 925
A.2d 999 (mem.) (vehicle
stops are proper under community caretaking doctrine when officer can
particularly describe “a perceived emergency or [an] indication of imminent
threat to specific individuals” before effectuating stop).  The key to the
constitutional permissibility of such police action is reasonableness, Marcello,
157 Vt. at 658, 599 A.2d at 358.  Community caretaking functions may be
“totally divorced from the detection, investigation, or acquisition of evidence
relating to the violation of a criminal statute.”  Cady
v. Dombrowski, 413 U.S. 433, 441 (1973).

¶ 10.         The
present case is a close one.  It is unlike our earlier community
caretaking stop cases in which the defendant or a third party expressly
communicated to an officer a message suggesting that someone was in distress.
 See State v. Campbell, 173 Vt. 575, 576, 789
A.2d 926, 928 (2001) (mem.) (holding that defendant’s
act of flashing high beams at marked police cruiser while defendant was parked
by information booth on particularly stormy night provided reasonable basis to
believe that people in car were seeking assistance); Marcello, 157 Vt.
at 657-58, 599 A.2d at 358 (affirming trial court’s decision that officer was
reasonable in his belief that defendant needed aid when another motorist
informed officer that there was “something wrong” with defendant).  

¶ 11.         Nor
is it clearly decided by our prior cases involving police seizures of
individuals in cars parked on the roadside or in designated lots.  We have
held that where a car was pulled over in an abnormal and unsafe location—barely
off the travel lane of the highway, late at night, and near a curve “such that
it presented a potential hazard to other motorists negotiating the curve in the
dark,” the officer did have reasonable grounds to believe the driver needed
help.  Edwards, 2008 VT 23, ¶¶ 6-7; see also State v. Theetge, 171 Vt. 167, 171, 759 A.2d 496, 499 (2000)
(holding stop of driver pulled over in breakdown lane of interstate highway was
justified because driver either violated law prohibiting parking in breakdown
lane in absence of emergency or had an emergency).

¶ 12.         On
the other hand, in State v. Jestice, we held
that the fact that a car was parked at nighttime in a relatively busy lot by a
trailhead near a state highway that was regularly patrolled by police was not
sufficient to support a seizure predicated on the community caretaking
doctrine.  2004 VT 65, ¶ 10, 177 Vt. 513, 861 A.2d
1060 (mem.).  Similarly, in Burgess,
we concluded that where a car was idling in a lawful pull-off by the side of
the road, with no indication that the car was disabled or anyone was ill or
otherwise in distress, police could not seize the individuals in the car on the
basis of a community caretaking rationale.  163 Vt. at 262, 657 A.2d at 203-04.  In the absence of any specific
indicia of distress, and given that the cars in these cases were safely and
lawfully parked in places designated for such parking, and at times and
locations that did not suggest distress, law enforcement’s concern for the
well-being of the occupants was not sufficient to justify the intrusion of a
seizure.

¶ 13.         On balance,
we conclude that the objective facts here did not provide sufficient grounds to
believe that defendant was in distress to warrant the trooper’s seizure. 
As the trial court noted, defendant’s car was stopped with its engine running
on the shoulder of a back-country road, where it posed no danger to oncoming
traffic.  Defendant had not been driving erratically or breaking any
traffic laws.  The court explicitly stated that “[i]f
those were the only relevant facts in this case, [the] Court would grant the
defendant’s [motion].”

¶ 14.         Nevertheless,
the trial court relied on other facts, including the fact that the officer had
been following the car when defendant pulled over, and that defendant did not
get out of the car, make a call, or undertake any other actions after pulling
over.  Given these circumstances, the court held that a police officer
could reasonably suspect that defendant “might be suffering a heart attack or
other serious problem, causing him to stop unexpectedly in a remote
location.”  Under our standard, these facts are not enough to support an
inference that defendant could be in distress.

¶ 15.         “[S]pecific and articulable facts,” not conclusory
speculations, are required to support a traffic stop under the community
caretaking exception.  Marcello, 157 Vt. at 658, 599
A.2d at 358.  Here, at no time did defendant (or any other occupant
of the car) signal distress to the officer.  The trooper’s sole bases for
stopping defendant were that (1) defendant pulled over to the side of the road,
and (2) defendant sat there for 30 seconds.  Although, superficially, the
facts of this case may resemble those in Edwards, 2008 VT 23—a case in
which the presence of a car pulled over in a dangerous position on the road was
itself a sufficient ground for conducting a community caretaking stop—there are
important distinctions between the cases. 

¶ 16.         First
and foremost, the trooper here did not just happen upon defendant’s car pulled
over on the roadway as did the officer in Edwards.  Here, the
trooper passed defendant on the road and decided to turn around and follow
defendant’s car in order to, as the trooper himself testified, “see if there was anything going on with the vehicle.” 
The trooper saw that all of the various lights on defendant’s car were
operating properly, and that defendant’s car was running fine.  From the
time the trooper first saw the defendant until he activated his blue lights
after turning around and following defendant for a period, he did not see
defendant speed or otherwise drive unsafely.  The trooper did not see
defendant commit any traffic violations.  Only after defendant pulled over
and then took no further observable action did the trooper’s acknowledged
motor-vehicle enforcement activity morph into a community caretaking
endeavor.  The trooper’s knowledge of the events leading up to defendant’s
pulling over to the side of the road provided much greater context to the
trooper than that available to the law enforcement officer in Edwards. 
Given that defendant had shown no signs of distress while the trooper observed
his driving, and that defendant only pulled over to the side of the road after
the trooper passed him, turned around, caught up to him, and followed him from
a distance of several car lengths, the reasonableness of the trooper’s
inference that defendant needed the trooper’s help was far weaker than in Edwards. 
Because he decided to closely follow the defendant, the trooper had a chance to
observe that defendant was driving safely, suggesting that defendant was not in
distress.  

¶ 17.         Second,
the trial court here expressly found that the car did not block the visibility
of oncoming traffic, that eastbound traffic would not have been affected by the
car, and that westbound traffic could pass the car by briefly crossing into the
east-bound.  In contrast, in Edwards we emphasized that the
location of defendant’s car was “abnormal and unsafe,” and that the car posed a
potential hazard to other motorists traveling around the nearby curve in the
dark.  2008 VT 23, ¶ 6.  Both the
objective indicia of distress—pulling over in an unsafe place—and the danger to
other drivers that were significant factors in Edwards are absent here.

¶ 18.         In
sum, the trial court recognized that defendant’s act of pulling to the side of
the road and stopping with his engine and lights on did not alone provide a
reasonable basis for the officer to believe that the operator needed help, but
concluded that the fact that defendant then simply did nothing for thirty
seconds after pulling over did provide such basis.  We respectfully
disagree.  If a driver’s pulling over and waiting patiently could, by
itself, trigger a community caretaking stop under the circumstances of this
case, it is hard to imagine what a law-abiding driver who does not want to be
followed closely by another car on a remote road at night could do to avoid
both the headlights in the mirror and the intrusion of a seizure. 

¶ 19.         We
all rely on law enforcement officers to promote public safety through means
other than the detection and investigation of crimes, and we do not mean to
unduly restrict the ability of police officers to offer help to people who
appear to need it.  It is important to respect law enforcement officers’
judgment in their exercise of the community caretaking function.  See Marcello,
157 Vt. at 658, 599 A.2d at 358 (“[P]olice have an
essential role as public servants to assist those in distress and to maintain
and foster public safety.” (quotation omitted)).
  Nevertheless, there must be an “objective indication that
caretaking was required.”  Burgess, 163 Vt. at 262, 657 A.2d at 204.  Had defendant indicated that he
needed help, or parked in a precarious location, this might be a different
case.  The facts here, however, demonstrate no such “objective indication”
that caretaking was required.  Id. 

¶ 20.         Moreover,
when a law enforcement officer’s offer of help takes the form of a
constitutional seizure, the intrusion, however well-intentioned, must satisfy
constitutional requirements.  We have noted the danger that an expansive
community caretaking doctrine presents to individuals’ right to privacy and
must take care not to allow the exception to “devour the requirement of
reasonable articulable suspicion.”  Id. at 262, 657
A.2d at 204.  In this case, the trooper could have taken steps
short of a traffic stop—such as slowly driving by defendant’s car while looking
through the driver’s window—to see whether defendant needed help. 
Instead, he activated his blue lights and restrained defendant’s liberty. 
If a police officer wants to check on someone who may be in distress, there are
usually ways to do so short of a seizure.  For the reasons set forth above,
the trooper did not have a sufficient basis to reasonably believe that
defendant was in distress or experiencing an emergency.*

Reversed.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











*  We do not consider
whether the seizure was warranted on the basis of any traffic violations
arising from defendant’s stopping his car in the traveled portion of the
road.  The state did not argue below or on appeal that the officer’s
actions were warranted on the basis of a reasonable suspicion of a traffic
violation.