

**FILED**
May 12 2016, 8:24 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer M. Lukemeyer
Voyles Zahn & Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mary Osborne,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 12, 2016

Court of Appeals Case No.
29A02-1511-CR-1931

Appeal from the Hamilton
Superior Court

The Honorable J. Richard
Campbell, Judge

Trial Court Cause No. 29D04-
1412-CM-10052

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Mary Osborne (Osborne), appeals the trial court's denial of her motion to suppress

We reverse and remand.

## ISSUE

Osborne raises one issue on interlocutory appeal, which we restate as follows: Whether the warrantless seizure of Osborne violated the Fourth Amendment to the United States Constitution or Article 1, Section 11 of the Indiana Constitution.

## FACTS AND PROCEDURAL HISTORY

On December 14, 2014, at approximately 1:00 a.m., Officer Jason Arnold (Officer Arnold) of the Fishers Police Department was assisting two other police officers with an operating while intoxicated investigation on 116th Street in Fishers, Hamilton County, Indiana. (Tr. p. 12). During the course of that investigation, dispatch advised that a clerk working at the Marathon gas station, located "near 116th Street and Brook[s] School Road[,]" had reported that "a female subject . . . was stuck underneath her vehicle in the parking lot." (Tr. p. 13). Officer Arnold responded to the call and drove to the gas station, which was approximately "a mile to a mile and a half" away. (Tr. p. 14). En route, dispatch apprised Officer Arnold of the vehicle's license plate number and that it "was a black passenger car, possibly a BMW." (Tr. p. 14).

[5]     As Officer Arnold neared the gas station, he received "an update from dispatch that the female had gotten herself out from under the vehicle and was leaving." (Tr. p. 15). When he arrived at the gas station, he observed a vehicle matching the reported description driving away. Although he did not witness the driver—later identified as Osborne—commit any traffic violations, Officer Arnold initiated a traffic stop. He stated that

> [d]ue to the nature of the call[,] I felt that it was necessary to stop the individual and check on [her] welfare. It's not very normal activity. It's not every day I receive this kind of call so I thought it was necessary to check on the welfare and the well[-]being of the individual.

(Tr. p. 16). He added that he "was concerned that [Osborne] potentially could have been seriously injured, broken bones or anything. Or something was wrong with [her] that started this whole thing to begin with because it's not normal behavior." (Tr. p. 17).

[6]     Officer Arnold approached the driver-side window, and although he did not observe any blood or other apparent injuries, he indicated that "there could be something wrong with her . . . internally. I couldn't see her feet or legs really from where I was at. She could have had a broken bone down there that I couldn't see. So I went to inquire from her if she had anything wrong with her that I didn't know about." (Tr. p. 22). He asked, "Ma'am, are you okay; are you hurt?" (Tr. p. 21). Osborne informed Officer Arnold that "she was fine" and declined medical treatment. (Tr. p. 23). Nevertheless, Officer Arnold remained "concerned because . . . it's not normal behavior. . . . I didn't know if

maybe she ha[d] something else going on, what was it that caused this or whatever. And I asked her what happened; what caused her to get trapped underneath her vehicle." (Tr. p. 23). Osborne explained that her vehicle has a manual transmission, and "when she exited the vehicle at the gas station she must have forgotten to put the parking brake on and it rolled back on top of her." (Tr. p. 23).

[7] Osborne's explanation convinced Officer Arnold that she was not in need of medical or other assistance. However, as he was questioning her, Officer Arnold noticed signs of possible impairment, including the odor of alcohol on her breath, red and watery eyes, and slurred speech. When Officer Arnold asked whether Osborne had consumed any alcohol, she stated that she had a beer about one hour earlier. According to the probable cause affidavit, Officer Arnold conducted several field sobriety tests, which Osborne failed. In addition, Officer Arnold administered a portable breathalyzer test, which indicated that Osborne's alcohol level was 0.12. After being transported to the Hamilton County Jail, Osborne submitted to another breath test, which revealed that her alcohol level was 0.10. On December 19, 2014, the State filed an Information, charging Osborne with Count I, operating a vehicle while intoxicated in a manner that endangers a person, a Class A misdemeanor, Ind. Code § 9-30-5-2(a)-(b); and Count II, operating a vehicle with an alcohol concentration equivalent to at least 0.08 gram of alcohol per 210 liters of the person's breath, a Class C misdemeanor, I.C. § 9-30-5-1(a)(2).

On June 24, 2015, Osborne filed a motion to suppress the evidence obtained during the course of the traffic stop. She argued that the warrantless seizure—*i.e.*, the traffic stop—violated both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. On September 15, 2015, the trial court conducted a hearing, and on October 5, 2015, the trial court issued a Suppression Order, denying Osborne's motion. The trial court noted that "[o]ne exception [to the warrant requirement] is the noncriminal, noninvestigative community caretaking function, which is used with caution in order to ensure that it is not used as a pretext for a criminal investigation." (Appellant's App. p. 29). The trial court concluded that "Officer Arnold stopped [Osborne's] vehicle as part of his 'community caretaking' function"; therefore, the warrantless seizure did not run afoul of either the federal Constitution or the Indiana Constitution. (Appellant's App. p. 28).

On October 29, 2015, Osborne filed a motion to certify the Suppression Order for interlocutory appeal, which the trial court granted on November 2, 2015. On December 11, 2015, our court accepted jurisdiction over the case. Osborne now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Our standard for reviewing a trial court's ruling on a motion to suppress is well settled. Similar to sufficiency matters, we must "determine whether substantial evidence of probative value exists to support the trial court's ruling." *Litchfield*

*v. State*, 824 N.E.2d 356, 358 (Ind. 2005). We do not reweigh the evidence, and we consider any conflicting evidence most favorably to the trial court's ruling. *Id.* Additionally, "[u]nlike typical sufficiency reviews, . . . we will consider . . . the uncontested evidence favorable to the defendant." *Gunn v. State*, 956 N.E.2d 136, 138 (Ind. Ct. App. 2011). We will uphold the trial court's ruling as long as it is sustainable on any legal theory apparent in the record. *Allen v. State*, 893 N.E.2d 1092, 1095 (Ind. Ct. App. 2008), *trans. denied*. "When the trial court's denial of a defendant's motion to suppress concerns the constitutionality of a search or seizure, . . . it presents a question of law, and we address that question de novo." *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014).

## II. *Fourth Amendment*

[11] Osborne claims that the trial court erred by denying her motion to suppress the evidence obtained during the course of the traffic stop because the stop itself violated the Fourth Amendment to the United States Constitution. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[] against unreasonable searches and seizures." U.S. CONST. amend IV. This protection is extended to the states through the Fourteenth Amendment. *Woodford v. State*, 752 N.E.2d 1278, 1280 (Ind. 2001). A warrant supported by probable cause is typically required in order for a search or seizure to be reasonable. *Breitweiser v. State*, 704 N.E.2d 496, 498 (Ind. Ct. App. 1999). Warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established

and well-delineated exceptions." *Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995). The State bears the burden of proving that an exception to the warrant requirement applies. *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010).

[12] "A traffic stop of an automobile and temporary detention of its occupants constitutes a 'seizure' within the meaning of the Fourth Amendment." *Bush v. State*, 925 N.E.2d 787, 789 (Ind. Ct. App. 2010) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). However, it is well established that a traffic stop is akin to an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), whereby a police officer "may stop and briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion of criminal activity even if the officer lacks probable cause to make an arrest." *Graham v. State*, 971 N.E.2d 713, 716 (Ind. Ct. App. 2012), *trans. denied*; *Crabtree v. State*, 762 N.E.2d 241, 245 (Ind. Ct. App. 2002). Thus, while "[a] law enforcement officer must have probable cause to instigate a full-blown arrest or a detention that lasts for more than a short period[,] . . . a traffic stop is valid under the Fourth Amendment if it is based on an observed traffic violation or if the officer has reasonable suspicion that the person detained is involved in criminal activity." *Killebrew v. State*, 976 N.E.2d 775, 779 (Ind. Ct. App. 2012), *trans. denied.* Reasonable suspicion must be based on "more than mere hunches or unparticularized suspicions." *Potter v. State*, 912 N.E.2d 905, 907 (Ind. Ct. App. 2009) (citing *Finger v. State*, 799 N.E.2d 528, 533-34 (Ind. 2003)).

[13]     In this case, there is no dispute that Officer Arnold's traffic stop was not based on his observation of any traffic violation or suspicion of criminal activity. Nonetheless, the State maintains that "Officer Arnold's concerns for [Osborne's] health and safety justified the slight intrusion of a traffic stop." (Appellee's Br. p. 11). The trial court agreed with the State and found that Officer Arnold had properly stopped Osborne pursuant to his community caretaking function.

[14]     The concept of a "community caretaking function" was first articulated in *Cady v. Dombrowski*, 413 U.S. 433, 441, 443 (1973), where, following an accident, officers conducted a warrantless search of an impounded vehicle in an effort to locate a firearm that the driver was known to possess in order "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." There, the Supreme Court stated that due to

> the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 441. As further described by our supreme court, the community caretaking function "is 'a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities.'" *Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 785 (1st Cir. 1991), *cert. denied*, 502 U.S. 1030 (1992)). Thus, "[t]he police are expected not only to enforce the criminal laws but also to aid those in distress, abate hazards, prevent potential hazards from materializing, and perform an infinite variety of other tasks calculated to enhance and maintain the safety of communities." *Id.*

[15] The community caretaking function "is a narrow exception to the privacy protections of the Fourth Amendment." *Killebrew*, 976 N.E.2d at 782. In Indiana, it has been applied as an exception to the warrant requirement only in cases where the police must conduct an inventory search because they are impounding a vehicle. *See, e.g.*, *Woodford*, 752 N.E.2d at 1281; *Jones v. State*, 856 N.E.2d 758, 762-63 (Ind. Ct. App. 2006), *trans. denied*. In those cases, the State is required to "demonstrate that: 'the belief that the vehicle posed some threat or harm to the community or was itself imperiled was consistent with objective standards of sound policing, and . . . the decision to combat that threat by impoundment was in keeping with established departmental routine or regulation.'" *Ratliff v. State*, 770 N.E.2d 807, 809-10 (Ind. 2002) (ellipsis in original) (quoting *Woodford*, 752 N.E.2d at 1281) (internal quotation marks omitted).

[16] In the present case, the trial court concluded that

> Officer Arnold was not engaged in a criminal investigation when he made the stop[] because he had observed no traffic violations. But he was concerned about the physical and mental condition of the driver. Officer Arnold stopped the vehicle as part of his "community caretaking" function. Needless to say, it is highly unusual for a person to get stuck under his or her own vehicle at a public gas station. Even if the person was not injured, there was the possibility of some type of mental impairment.

(Appellant's App. p. 28). On appeal, Osborne contends that "[t]he trial court created an exception to the warrant requirement that does not exist under these circumstances." (Appellant's Br. p. 6). On the other hand, the State is essentially requesting that we affirm the trial court's extension of the community caretaking function exception to validate a traffic stop where an officer neither observes a traffic violation nor has any reasonable suspicion that criminal activity is afoot. According to the State, "[a] driver impaired by physical injury or mental condition endangers both themselves and the public by operating a vehicle on public roads." (Appellee's Br. p. 12).

[17] Our court has previously declined to extend the community caretaking function to Fourth Amendment privacy protections in a case where a police officer "was attempting to ensure the safety of the public by stopping a potentially impaired driver." *Killebrew*, 976 N.E.2d at 782-83. In *Killebrew*, a police officer conducted a traffic stop after observing that the defendant's turn signal was activated but the defendant continued through an intersection without turning, which is not a traffic violation. *Id.* at 778, 781. Although the officer did not observe any traffic infractions, he believed that the driver might be impaired

based on the turn signal. *Id.* at 778. Because the purpose of the officer's stop was to investigate whether the defendant was intoxicated, we found that "his subsequent search was an extension of a criminal investigation and was not a product of an administrative caretaking function." *Id.* at 783. Conversely, in the case at hand, Officer Arnold testified that the initial purpose of his stop was to check on Osborne's welfare because he believed she might need medical attention, and the stop only converted to a criminal investigation after Officer Arnold detected the odor of alcohol on Osborne's breath. Nevertheless, we find no published Indiana decisions that have extended the community caretaking function beyond inventory searches of impounded vehicles.

[18] Subsequent to *Cady*—wherein the United States Supreme Court conceived the community caretaking doctrine, numerous other state courts have adopted the community caretaking function as an exception to the Fourth Amendment warrant requirement in situations beyond inventory searches of impounded cars. *See Cady*, 413 U.S. at 441. For instance, the trial court in the instant case was persuaded by *State v. Acrey*, 64 P.3d 594 (Wash. 2003). In *Acrey*, police officers responded to an anonymous call that juveniles were fighting on a city street; when the officers located the juveniles, they discovered that "no one had been fighting, no one was injured, and no criminal activity was underway." *Id.* at 596. Yet, because "it was after midnight on a week night in a commercial area with no open businesses and no nearby residences[,]" the officers directed the minor boys to sit on the sidewalk while the officers called their parents. *Id.* The defendant's mother requested that the officers drive him home, so before

placing the defendant in the squad car, the officers conducted a pat-down search for weapons, which yielded marijuana and cocaine. *Id.* at 596-97. The defendant challenged the constitutionality of the seizure—arguing that his detainment exceeded the scope of a permissible *Terry* stop; in turn, the State posited that the defendant's "encounter with the police officers involved the 'routine check on health and safety' aspect of the 'community caretaking function' exception." *Id.* at 599-600.

[19] The *Acrey* court recognized that "[m]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid." *Id.* at 599 (alteration in original) (internal quotation marks omitted). Thus, the court stated that "[i]n determining whether an officer's encounter with a person is reasonable as part of a routine check on safety, we must balance the 'individual's interest in freedom from police interference against the public's interest in having the police officers perform a community caretaking function." *Id.* at 600 (internal quotation marks omitted). This reasonableness inquiry requires balancing the competing interests "in light of all the surrounding facts and circumstances." *Id.* at 599. Ultimately, the *Acrey* court concluded that the officers reasonably acted within their community caretaking capacity by detaining the minor defendant in order to contact his mother. *Id.* at 602.

[20] Like the *Acrey* court, it appears that the other state courts that have adopted the community caretaking function exception "have required, at a minimum, that

the officer's actions must be measured by a standard of reasonableness." *Poe v. Commonwealth*, 169 S.W.3d 54, 58 (Ky. Ct. App. 2005). However, the specific tests utilized to determine whether an officer acted reasonably "are not consistent across all of the jurisdictions." *State v. Lovegren*, 51 P.3d 471, 474 (Mont. 2002). Moreover, "[t]he core of the community-caretaking doctrine . . . has been left with little doctrinal guidance from the Supreme Court other than the vague command of reasonableness." *State v. Kurth*, 813 N.W.2d 270, 273 (Iowa 2012)). Thus, "[e]laboration of the doctrine has been left to other courts, especially state courts. This latter development is not surprising in light of the fact that community caretaking is generally the role of local police rather than federal officers." *Id.* at 273-74.

[21]     Our review of case law in other jurisdictions reveals that a significant number of states employ some version of a totality of the circumstances test to assess whether an officer's community caretaking conduct (in the context of a traffic stop) is unreasonable such that it violates the Fourth Amendment.[1] In a similar

---

[1] *See, e.g., State v. Deccio*, 34 P.3d 1125, 1128 (Idaho Ct. App. 2001) (requiring the officer to possess a *subjective* belief that an individual is in need of immediate assistance "in view of all the surrounding circumstances"); *People v. McDonough*, 940 N.E.2d 1100, 1109 (Ill. 2010) (utilizing a two part test requiring the officer to "be performing some function other than the investigation of a crime" and that the search or seizure "be reasonable because it was undertaken to protect the safety of the general public" where the officer's reasonableness "is measured in objective terms by examining the totality of the circumstances"); *Trejo v. State*, 76 So.3d 684, 689 (Miss. 2011) (asking "whether a reasonable person, 'given the totality of the circumstances, would believe [the individual] *is in need of help*' or that the safety of the public is endangered"); *State v. Rohde*, 864 N.W.2d 704, 709 (Neb. Ct. App. 2015) (stating that a court should "assess the totality of the circumstances surrounding the stop, including all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction"), *review denied*; *State v. Moats*, 403 S.W.3d 170, 188 (Tenn. 2013) (requiring that "the totality of the circumstances must be considered to determine whether the police officer was acting within a community caretaking role" which Tennessee classifies as a consensual encounter, rather than a seizure, under the Fourth Amendment); *Wright*

vein, other courts simply require that there be objective, specific and articulable facts that would lead an officer to reasonably believe that a citizen is in distress, peril, or otherwise in need of assistance.[2] Finally, there is also a line of decisions that require imminent danger or life-threatening circumstances before an officer may initiate a traffic stop on less than reasonable suspicion.[3]

[22] Using a combination of elements from the states' various tests, Wisconsin implemented a three-pronged analysis "for evaluating claims of police community caretaker functions." *State v. Kramer*, 759 N.W.2d 598, 605 (Wis. 2009). Under Wisconsin's approach, a court must determine "(1) that a seizure within the meaning of the [F]ourth [A]mendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3)

---

*v. State*, 7 S.W.3d 148, 151-52 (Tex. Crim. App. 1999) (allowing an officer to "stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help" and setting forth the following relevant factors to consider: "(1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted—presented a danger to himself or others"); *Acrey*, 64 P.3d at 599 (discussed above); and *Ullom v. Miller*, 705 S.E.2d 111, 122 (W. Va. 2010) (requiring the State to establish four elements, including, in part, that "[g]iven the totality of the circumstances, a reasonable and prudent police officer would have perceived a need to promptly act" and that the officer "must be able to articulate specific [and objectively reasonable] facts that, taken with rational inferences, reasonably warrant the intrusion").

[2] *See, e.g., Marsh v. State*, 838 P.2d 819, 820 (Alaska Ct. App. 1992); *Agreda v. State*, 152 So.3d 114, 116 (Fla. Dist. Ct. App. 2014); *Poe*, 169 S.W.3d at 58; *Lovegren*, 51 P.3d at 475-76; and *State v. Button*, 86 A.3d 1001, 1003 (Vt. 2013).

[3] *See, e.g., Meeks v. State*, 479 S.W.3d 559, 564 (Ark. Ct. App. 2016) (requiring an "objective basis for believing that someone in the vehicle was in immediate need of medical assistance or was in imminent danger"); *State v. Barzacchini*, 17 N.E.3d 1186, 1191 (Ohio Ct. App. 2014) (permitting a community caretaking stop where "a law enforcement officer [has] objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury"); and *Provo City v. Warden*, 844 P.2d 360, 364 (Utah Ct. App. 1992) (implementing a three-step analysis, which demands, in part, that the circumstances objectively "demonstrate an imminent danger to life or limb"), *aff'd*, 875 P.2d 557 (Utah 1994).

if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual." *Id.* (quoting *State v. Anderson*, 417 N.W.2d 411, 414 (Wis. Ct. App. 1987)). During the second step—*i.e.*, whether the police conduct was bona fide community caretaker activity—"a court considers whether police conduct is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id.* at 606 (quoting *Cady*, 413 U.S. at 441). This determination is based on an examination of the totality of the circumstances as they existed at the time of the police officer's conduct. *Id.* at 608. While a police officer's subjective intent may be a factor to consider in the totality of the circumstances, when "an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.* The third step—the balance of public needs against individual privacy interests—assesses whether the officer's exercise of his/her community caretaker function was reasonable. *Id.* at 610. "The stronger the public need and the more minimal the intrusion upon an individual's liberty, the more likely the police conduct will be held to be reasonable." *Id.* at 611. Wisconsin courts consider the following factors in balancing these interests:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.* Applying this test, the Wisconsin Supreme Court determined that an officer properly acted within his community caretaker function when he stopped to offer assistance to a driver who was parked on the side of the road with his hazard lights flashing. *Id.* at 601, 612. *See Kurth*, 813 N.W.2d at 277 (espousing a test similar to Wisconsin's, but in determining whether an officer was engaged in bona fide community caretaker activity, Iowa considers whether the conduct falls within "(1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, [or] (3) the 'public servant' exception"); and *State v. Smathers*, 753 S.E.2d 380, 386 (N.C. Ct. App. 2014) (adopting Wisconsin's test).

[23] Like the "majority of state courts throughout the country" that have adopted the community caretaking exception, we recognize that law enforcement officers do have community safety and welfare duties beyond their criminal investigatory duties. *Smathers*, 753 S.E.2d at 384. Accordingly, we find that the community caretaking function exception may be used as a means of establishing the reasonableness of a traffic stop under the Fourth Amendment. We further find that the three-pronged test utilized by Wisconsin "provides a flexible framework within which officers can safely perform their duties in the public's interest while still protecting individuals from unreasonable government intrusions." *Id.* at 386. We now apply this test to the specific facts of Osborne's case.

[24] First, as to whether there was a seizure within the meaning of the Fourth Amendment, there is no dispute that Osborne was seized when Officer Arnold

conducted the traffic stop.  Turning to the second prong—whether the police conduct was bona fide community caretaker activity, we find that Officer Arnold articulated a basis for conducting the traffic stop that was unrelated to his criminal investigative duties.  He testified that his "main focus was the concern for the individual's safety.  Were they [sic] hurt[?]  Did they [sic] need paramedics[?]  You know, was it something serious[], the severity of the injuries, if any.  Things like that."  (Tr. p. 18).  While Officer Arnold may have possessed some subjective belief that Osborne was impaired when he initiated the stop (given his testimony that he "was concerned because . . . it's not normal behavior"), he stated that the basis for the traffic stop was to ascertain whether Osborne required medical attention, which is an objectively reasonable bona fide caretaking function.  (Tr. p. 23).

[25]    Lastly, the third step requires a balance of the public's need against the individual's privacy interests to determine whether the officer's conduct was reasonable.  *Kramer*, 759 N.W.2d at 610.  Here, we conclude that the public need and interest did not outweigh the intrusion into Osborne's privacy.  Officer Arnold responded to a call that an individual "was stuck underneath her vehicle."  (Tr. p. 13).  No further details were provided regarding the manner in which the person was "stuck" or the severity thereof.  (Tr. p. 13).  Before he even arrived at the scene, Officer Arnold learned that the individual— Osborne—had freed herself and was leaving the gas station.  There was no indication from the reporting source that Osborne was injured, in need of medical attention, or otherwise in distress; nor did the caller suggest that

Osborne had demonstrated any other concerning conduct indicative of a mental impairment.

[26] Moreover, Officer Arnold drove behind Osborne and did not personally observe any specific behavior that would give rise to a concern that she was in need of assistance, such as swerving, weaving, or erratic driving. *See Poe*, 169 S.W.3d at 59 (finding the community caretaking exception did not apply where an officer stopped an apparently lost driver in order to offer directions as there was "no evidence such as a flat tire, flashing lights, jumper cables, a raised hood or any other indication that [the defendant] required assistance"); and *Button*, 86 A.3d at 1002, 1004 (concluding that the objective grounds did not provide a reasonable basis to believe the driver was in distress where a vehicle stopped on the shoulder of a back-country road, where it posed no danger to oncoming traffic" and where the defendant "had not been driving erratically"). Instead, the fact that Osborne freed herself from her "stuck" position and was able to safely drive her vehicle without any incident indicates that the situation did not warrant immediate assistance. (Tr. p. 13).

[27] Furthermore, during the hearing, Officer Arnold stated that if Osborne had requested medical attention, his response would have been to summon paramedics. We note that if Osborne had desired medical attention, she could have easily asked for help at the gas station instead of driving away. *See Smathers*, 753 S.E.2d at 387 (noting that the public's need and interest in a police officer conducting a stop after observing a motorist strike a large animal outweighed the defendant's individual privacy interest, in part, because the

seizure occurred on a "rural and dimly lit stretch of road" and "there was a lower probability that [the] defendant could have gotten help from someone if she needed it"); *see also McDonough*, 940 N.E.2d at 1109-10 (finding the community caretaker function exception applied where a car was parked alongside the road with its emergency flashers activated because "[t]he public has a substantial interest in ensuring that police offer assistance to motorists who may be stranded on the side of a highway, especially after dark and in areas where assistance may not be close at hand"). If there had been any articulable facts prior to the stop to support Officer Arnold's belief that Osborne was in *immediate* need of assistance—such as more details about the nature of the incident from the individual who called or any indication that Osborne sustained injuries which affected her ability to drive—then our conclusion would likely be different. Instead, based on the facts before this court, we cannot say that Officer Arnold's traffic stop was justified pursuant to his community caretaking function.[4] Therefore, the evidence obtained as a result of the invalid traffic stop should have been excluded.

## CONCLUSION

Based on the foregoing, we conclude that the community caretaking function of police officers may apply to justify a traffic stop where the officer does not otherwise observe a traffic violation or have a reasonable suspicion that

---

[4] Because we conclude that Officer Arnold's traffic stop was invalid under the Fourth Amendment, we need not address Osborne's separate argument that the traffic stop violated her rights under Article 1, Section 11 of the Indiana Constitution.

criminal activity is afoot. However, based on the facts of this case, we conclude that the exercise of Officer Arnold's community caretaking function was not reasonable and, therefore, violated Osborne's Fourth Amendment rights.

[29] Reversed and remanded.

[30] Pyle, J. concurs

[31] Kirsch, J. dissents without separate opinion