DA 06-0670

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 358

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

RANDY EARL GRAHAM,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 2005-0944
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jim Wheelis, Chief Appellate Defender, David C. Avery, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Hon. Mike McGrath, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

          Dennis Paxinos, Yellowstone County Attorney, Georgette Hogan, Deputy
County Attorney, Billings, Montana

                Submitted on Briefs:  November 8, 2007

                           Decided:  December 31, 2007

Filed:

_____
                  Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Appellant Randy Earl Graham (Graham) appeals the denial of his motion to suppress by the District Court of the Thirteenth Judicial District, Yellowstone County. We reverse the District Court's denial of Graham's motion.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 On Sunday October 2, 2005, Yellowstone County Sheriff's Deputy Valerie Juhl (Juhl) was on a routine patrol in the Lockwood area outside of Billings, Montana. Juhl was driving on Coulson Road East approaching the point of intersection between it and Coulson Road, when she observed a white Chevy S-10 pickup truck lawfully pass through the intersection. The pickup was driven by Graham, with his common-law wife, Mary Ann Strauser, riding as a passenger. The pickup continued on Coulson Road, turning from Coulson onto a pullout out of Juhl's range of sight. Shortly thereafter, Juhl drove down Coulson Road and observed the pickup parked on a dirt pullout within plain sight of the road. Because Juhl did not normally observe vehicles parked in that area, the location of the pickup piqued her attention. Juhl surmised that the driver of the pickup had parked there because he was having vehicle problems and decided to investigate the matter further.

¶3 As it turned out, Graham was not, in fact, experiencing vehicular difficulties. When Juhl drove down Coulson Road past the location of the pickup, she noticed Graham and Strauser kissing. As she continued on, Juhl saw Strauser attempt to "mount" Graham. Concerned that Graham and Strauser were engaged in inappropriate sexual behavior, Juhl drove down to the next pullout on Coulson Road, and then circled back

2

behind the pickup. After stopping her vehicle, Juhl activated her emergency lights, exited her vehicle, and approached the pickup. According to Juhl, her intent in approaching Graham and Strauser was to discourage them from engaging in their "inappropriate behavior" and to "move them along."

¶4 As she approached the pickup, Juhl observed a cold, sweaty beer can right outside the driver's side door. She picked it up and drained it on the ground. As Juhl approached the pickup, she observed through the windows that Strauser's pants were undone and that Graham's were partly pulled down his legs, with his waistband underneath his bottom. Juhl requested identification from Graham and Strauser, and asked them what they were doing. They responded that they were just there kissing. Juhl informed them that, from her perspective at least, they seemed to be going beyond this conduct, and the location they had chosen for their activity was not appropriate. As Juhl questioned Graham and Strauser and asked for their identification, she noticed that Graham's speech was slurred and detected an odor of alcohol. She also observed that Strauser appeared intoxicated and was difficult to understand. After further questioning, Graham admitted to having a beer approximately thirty minutes earlier. Subsequent investigation and testing by Juhl, which is not questioned on appeal, led to Graham's arrest for DUI.

¶5 On October 6, 2005, Graham was charged by Information with a felony DUI and failure to carry personal liability insurance. At trial, Graham moved to suppress the evidence obtained by Juhl, arguing that Juhl lacked authority for the investigative stop and that, assuming Juhl had such authority, she exceeded its scope. The District Court denied Graham's motion. On the one hand, the District Court found that Juhl did not

have particularized suspicion for the stop. However, the District Court concluded that the "community caretaker" doctrine as adopted by this Court in *State v. Lovegren*, 2002 MT 153, 310 Mont. 77, 51 P.3d 471, provided a legal justification for Juhl's stop, investigation, and subsequent arrest of Graham. Graham was ultimately convicted on both counts. For the DUI conviction, Graham received a sentence of thirteen months with the Department of Corrections, followed by four years probation.

¶6 Graham appeals the District Court's denial of his motion to suppress, and urges us to reverse the District Court's decision. He argues that Juhl did not have particularized suspicion for the stop, and that the District Court erred in its application of the community caretaker doctrine to the facts of this case. The State urges us to affirm. The State argues that the District Court correctly applied the community caretaker doctrine to this case and, alternatively, that Juhl did have particularized suspicion justifying her stop, subsequent investigation, and arrest of Graham. Graham timely appeals from the District Court's decision.

## ISSUES

¶7 We restate the issues on appeal as follows:

¶8 **ISSUE ONE**: Did the District Court err in concluding that there was no particularized suspicion to justify Juhl's initial seizure of Graham?

¶9 **ISSUE TWO:** Did the District Court err in concluding that the community caretaker doctrine provided a justification for Juhl's seizure of Graham?

## STANDARD OF REVIEW

4

¶10     We review a district court's denial of a motion to suppress in order to determine whether its findings of fact were clearly erroneous and whether it has correctly applied those findings as a matter of law. *State v. Wheeler*, 2006 MT 38, ¶ 12, 331 Mont. 179, ¶ 12, 134 P.3d 38, ¶ 12. Findings of fact are clearly erroneous when they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or a review of the record leaves this Court with the conviction that a mistake has been committed. *Wheeler*, ¶ 12.

## DISCUSSION

¶11     **Issue One**:   Did the District Court err in concluding that there was no particularized suspicion to justify Juhl's initial seizure of Graham?

¶12     The Fourth Amendment to the U.S. Constitution and Article II, Section 11 of the Montana Constitution protect the citizenry from unreasonable searches and seizures at the hands of government officials. By virtue of the Right to Privacy, Article II, Section 10 of the Montana Constitution, Montanans are afforded even greater protections against governmental intrusions than those provided under the U.S. Constitution. *State v. Bullock*, 272 Mont. 361, 384, 901 P.2d 61, 75-76 (1995). The protections of these constitutional provisions come into play when an individual has been "seized" by government officials. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *State v. Case*, 2007 MT 16, ¶ 24, 338 Mont. 87, ¶ 24, 162 P.3d 849, ¶ 24 (quotation omitted,

alterations in original).  The same standard applies to seizures under Article II, Section 11 as well.  *Case*, ¶ 24.

¶13    Both the Fourth Amendment and Article II, Section 11 require that governmental officials obtain a validly issued warrant prior to conducting a search or seizure of an individual.  Accordingly, searches and seizures without a valid warrant are considered *per se* unreasonable and will be lawful only if the search and seizure falls within a recognized exception to the warrant requirement.  *Case*, ¶ 19.  One of these exceptions, known as the "*Terry* stop," authorizes a "brief seizure of the individual [so long as it is] supported by a reasonable suspicion of criminal activity . . . ."  *Lovegren*, ¶ 15 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)).  In Montana, the standard for a *Terry* stop is codified at § 46-5-401(1), MCA, as follows:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

¶14    An investigative stop under this statute can last no "longer than is necessary to effectuate the purpose of the stop."  Section 46-5-403, MCA.

¶15    The validity and legality of an investigative stop hinges upon the existence of particularized suspicion justifying the stop in the first place.  "The question of whether particularized suspicion of wrongdoing exists is a factually driven inquiry dependent upon the totality of circumstances."  *Case*, ¶ 34.  "In evaluating the totality of the circumstances, a court should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer."  *State v. Martinez*, 2003 MT 65,

¶ 23, 314 Mont. 434, ¶ 23, 67 P.3d 207, ¶ 23 (citations omitted). If particularized suspicion is absent, and no other exception to the warrant requirement applies, the search and seizure is unconstitutional.

¶16 In this case, once Juhl activated her emergency lights, a reasonable person in Graham's shoes would not have felt free to walk away, therefore he was seized within the meaning of the Fourth Amendment and Article II, Section 11. The State concedes as much in its briefs. The question then becomes whether Juhl had particularized suspicion justifying the seizure in the first place. The District Court concluded that no such particularized suspicion existed. The District Court found that Juhl had not observed Graham driving erratically or illegally, and had not received any reports from citizens concerning the driving of the pickup. When Juhl passed the pickup, all she observed was Graham and Strauser kissing and Strauser "mounting" Graham. While Juhl stated that she surmised possible violations of the law could occur, she observed none prior to pulling behind Graham and Strauser and turning on her emergency lights.

¶17 The District Court noted that being in a high-crime zone and mere possible violations of the law are not sufficient to establish particularized suspicion. See *State v. Reynolds*, 272 Mont. 46, 51, 899 P.2d 540, 543 (1995) (holding that "possible" traffic violation not sufficient to justify an investigatory stop); *State v. Jarman*, 1998 MT 277, ¶¶ 14-15, 291 Mont. 391, ¶¶ 14-15, 967 P.2d 1099, ¶¶ 14-15 (mere presence in a high crime area does not give rise to particularized suspicion). Beyond possible violations of the law, or arguably being in an area where a crime could occur, the District Court

concluded that the totality of the circumstances did not give rise to particularized suspicion.

¶18 On appeal, the State urges us to revisit the District Court's analysis and conclude that Juhl had particularized suspicion for the investigative stop of Graham. The State asserts that a reasonable officer in Juhl's shoes could not be certain that Graham and Strauser were not committing, or about to commit, such crimes as indecent exposure, sexual assault, sexual intercourse without consent, or sexual abuse of a child. The State argues that Juhl's observation of Strauser kissing and mounting Graham in a remote public place, in broad daylight, and in plain sight of a public road, was sufficient to give rise to a particularized suspicion supporting the investigative stop. The State argues that *State v. Henderson*, 1998 MT 233, 291 Mont. 77, 966 P.2d 137 supports its argument.

¶19 We disagree. The District Court correctly held that Juhl did not have particularized suspicion for the investigative stop of Graham and Strauser. While the particularized suspicion standard does not require that an officer be certain an offense has been committed, *State v. Farabee*, 2000 MT 265, ¶ 19, 302 Mont. 29, ¶ 19, 22 P.3d 175, ¶ 19, it requires far more than Juhl had here. The District Court's findings on this point are dispositive. When Juhl passed by Graham and Strauser she saw two people, fully clothed, parked in a remote location, kissing passionately, with Strauser on top of Graham. Graham and Strauser's behavior, while perhaps offensive to Juhl's moral sensibilities, is not criminal activity. Nor does it indicate that criminal wrongdoing is occurring. The argument, advanced here by the State, that all varieties of sexual crimes

8

are about to occur whenever fully-clothed individuals in a remote public place engage in public displays of mutual affection during the daylight hours, is simply unsupportable.

¶20     Any particularized suspicion which arose in this case did so only after Graham was seized. Because the sweaty beer can and the state of undress of Graham and Strauser were observed by Juhl after she had seized them, they could not form a basis for particularized suspicion justifying the seizure in the first place. While Juhl claims that her intention in stopping Graham and Strauser was to simply "move them along," and encourage them to engage in their "inappropriate behavior" elsewhere, that is not what she did. Instead, Juhl seized them within the meaning of the Fourth Amendment and Article II, Section 11, despite the fact that she lacked the particularized suspicion necessary to do so.

¶21     In this connection, we note that the State's reliance on *Henderson* is misguided. There, a police officer had particularized suspicion for a traffic stop because he witnessed a car being driven without license plates, and could not read the temporary sticker because it was obscured by the rear window. *Henderson*, ¶¶ 4-5. The officer was justified in stopping the vehicle in *Henderson* because failure to conspicuously display valid license plates or a temporary sticker is a violation of the law. *Henderson*, ¶ 13. As for this case, the Legislature has not yet outlawed the type of conduct in which Graham and Strauser were engaging. Therefore, Juhl had no legal justification for her seizure of Graham.

¶22     The Dissent faults the Court for concluding there was no particularized suspicion for the stop of Graham and Strauser. The Dissent seems to implicitly recognize that its

contentions are not supported by the actual facts of this case when it states that "virtually any fact which *may have been added* to the situation here would have supported, not just particularized suspicion, but probable cause that a sex crime was being committed." (Emphasis added). However, it is not our role to add facts to the record. Moreover, it bears repeating that Officer Juhl herself did not approach the vehicle because she believed a crime was being committed, as § 46-5-401(1), MCA requires; she did so because she thought their behavior was "inappropriate" and she wanted to "move them along." It is not this Court's role to inject particularized suspicion when the officer, by her own admission, did not have it.

¶23    Accordingly, we affirm the District Court's conclusion that Juhl did not have particularized suspicion for her investigative stop of Graham.

¶24    **Issue Two:** Did the District Court err in concluding that the community caretaker doctrine provided a justification for Juhl's seizure of Graham?

¶25    In *Lovegren*, this Court adopted the community caretaker doctrine. The community caretaker doctrine, like the *Terry* investigative stop, is a recognized exception to the Fourth Amendment's and Article II, Section 11's prohibitions against unreasonable searches and seizures. *Lovegren*, ¶¶ 16-17. This doctrine is operative in cases where law enforcement initiates contact with a citizen not in order to investigate the commission of a crime, but to investigate a potential vehicle accident, or otherwise ensure the safety of citizens. *Lovegren*, ¶ 17. We use the following test to determine if the community caretaker exception to the warrant requirement applies in an encounter between government officials and citizens:

10

First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

*Lovegren*, ¶ 25.

¶26 If the *Lovegren* requirements are met, then law enforcement officers may temporarily seize a citizen, in the absence of a warrant or particularized suspicion, without running afoul of the prohibition against unreasonable searches and seizures contained in the Fourth Amendment to the U.S. Constitution or Article II, Section 11 of the Montana Constitution.

¶27 In denying Graham's motion to suppress, the District Court recognized this case was a "close call," but nonetheless concluded that Juhl's seizure of Graham and Strauser fell within the community caretaker doctrine. In its findings, the District Court noted that Graham was not outside of his car seeking help from passersby, that Juhl did not need to warn Graham of any danger, and that Graham was not unconscious or passed out. Instead, the District Court recognized that the location of the pickup was "unusual" and that the community caretaker doctrine justified Juhl's stop because "[c]hecking on a truck out in the middle of nowhere could save a life someday."

¶28 Graham argues that the District Court incorrectly applied the community caretaker doctrine in the instant case. Graham notes that the community caretaker doctrine applies

11

only in situations which are totally unrelated to the investigation and detection of crime, and that this doctrine cannot be used as a justification for investigative stops in cases where the governmental officers would otherwise lack a legal justification to detain and question an individual. Graham asserts that by Juhl's own admission the purpose of her stop was not concerned with Graham and Strauser's safety, but with what she considered to be their inappropriate public behavior, and her desire to use her authority as a law enforcement officer to move them along. Graham argues that the community caretaker doctrine has no applicability in this context.

¶29 The State argues that the District Court's conclusions on this point were correct. The State contends that the objective and articulable facts justifying Juhl's stop come from two sources: first, the unusual location of the car; and second, the observation that Graham and Strauser were kissing, and that Strauser had mounted Graham which, in spite of the District Court's findings, the State maintains was evidence of Strauser and Graham engaged in a sexual act. Additionally, the State argues that Juhl's intent to "move them along" falls within the scope of law enforcement actions justified by the community caretaker doctrine.

¶30 We disagree and conclude that the District Court erred in its application of the community caretaker doctrine. As noted above, the first step in examining whether the community caretaker doctrine applies is to determine if "there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril . . . ." *Lovegren*, ¶ 25. Here, no such facts existed. Although initially Juhl might have been concerned that the unusual location of the pickup indicated

12

Graham and Strauser were having vehicle problems, the evidence of their conduct which she witnessed as she passed their vehicle completely obviated those concerns. It is clear they were not parked there because they were in peril, and nothing observed by Juhl suggested otherwise. Moreover, by Juhl's own admission, she did not stop and question Graham in order to assist them, but instead to "move them along."

¶31 We reject the notion that the community caretaker doctrine justifies an investigatory stop based on nothing more than a desire by officers to "move someone along" or prevent "inappropriate public behavior." The State is overreaching to suggest the doctrine supports such actions by governmental officials. The State argues that under *State v. Nelson*, 2004 MT 13, 319 Mont. 250, 84 P.3d 25, *State v. Seaman,* 2005 MT 307, 329 Mont. 429, 124 P.3d 1137, and *State v. Litschauer*, 2005 MT 331, 330 Mont. 22, 126 P.3d 456, the facts of this case implicated Juhl's duty to investigate uncertain situations in order to ensure public safety. Those cases are distinguishable because the officers' observations in those cases all indicated a credible risk of peril or danger. In *Nelson* and *Seaman*, the community caretaker doctrine applied when officers stopped to investigate cars parked off highways during sub-zero or near-zero temperatures. *Nelson*, ¶ 4; *Seaman*, ¶ 3. In *Litschauer*, the community caretaker doctrine applied when an officer received a 911 call of an extremely agitated woman who was screaming and banging her head on her car prior to driving away. *Litschauer*, ¶ 3. These situations presented facts which objectively suggested citizens in peril, thus justifying investigation by law enforcement officials under the community caretaker doctrine. What the State seeks here is a new exception to the community caretaker doctrine which would allow a law

enforcement officer equipped with nothing more than personal dissatisfaction with a person's otherwise lawful conduct to detain that person, without any intention of providing "community care" or assistance. We decline to so extend the doctrine.

¶32 Accordingly, we reverse the District Court's denial of Graham's motion to suppress. The District Court erred when it concluded that Graham had articulable and objective facts indicating that Graham and Strauser were in peril and that the community caretaker doctrine justified the investigative stop.

## CONCLUSION

¶33 We reverse the District Court's denial of Graham's motion to suppress, and remand for further proceedings consistent with this opinion.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON

Justice Jim Rice dissenting.

¶34 While we may prefer to look the other way and keep on driving, a law enforcement officer does not have that luxury when public behavior is potentially

14

unlawful. Likewise, the law requires of this Court a fair review, even if the particular conduct at issue is sex.

¶35 The Court faults the officer's stop because a couple having sex while parked in an admittedly public place "is not criminal activity" and did not "indicate that criminal wrongdoing was occurring." It may come as a surprise to some that having sexual intercourse in public circumstances is neither a criminal activity nor activity giving rise to a suspicion of wrongdoing. It always has been in the past.

¶36 The Court vaguely dismisses the State's arguments about the potential criminal charges which could have related to this sexual conduct as "simply unsupportable," and states that particularized suspicion "requires far more"—but fails to explain just what more would have been required before an officer could stop "to obtain or verify an account of the person's presence or conduct" in a situation involving sex in public circumstances. Section 46-5-401, MCA. I submit that, far from needing "far more," virtually any fact which may have been added to the situation here would have supported, not just particularized suspicion, but probable cause that a sex crime was being committed. For example, if the woman had called for help, or if the couple had been unclothed in a slightly more exposed way, the officer would have had probable cause to respond.

¶37 In contrast, particularized suspicion requires only "objective data" from which an officer may make inferences leading to a suspicion of wrongdoing. The District Court's Finding Nos. 6 and 7, that the officer observed the couple while engaged in a kiss followed by the passenger mounting the defendant along a public road on the officer's

15

routine patrol route constituted sufficient data for the officer to stop and inquire. However, from now on, officers will only be able to wave as they drive by.

¶38     We should not allow our squeamishness to turn our eyes from the law. There was particularized suspicion for a stop, and I would affirm.

/S/ JIM RICE