APPEL, Justice (dissenting).
I respectfully dissent. For the reasons expressed below, I would hold that the search and seizure was unlawful under article I, section 8 of the Iowa Constitution. In order to fully understand the context of today's decision, it is necessary to review the purposes of constitutional provisions related to search and seizure, development of the "community caretaking" exception in the United States Supreme Court, the state and federal caselaw attempting to apply it, and the implications the doctrine may have on search and seizure law generally.
I. Purpose of Constitutional Provisions Related to Search and Seizure.
It is important at the outset to understand the purposes of Search and Seizure Clauses in the State and Federal Constitutions. The central purpose of the Fourth Amendment and article I, section 8 of the Iowa Constitution"is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." South Dakota v. Opperman , 428 U.S. 364, 377, 96 S.Ct. 3092, 3101, 49 L.Ed.2d 1000 (1976) (Powell, J., concurring). The search and seizure provisions are not enabling acts designed to justify ever-expanding kinds of police intrusion but are designed to limit authorities to proper bounds. The search and seizure provisions of both the Federal and Iowa Constitutions show a distrust of police power and standardless discretion. See Tracey Maclin, The Central Meaning of the Fourth Amendment , 35 Wm. & Mary L. Rev. 197, 201 (1993).
The United States Supreme Court, of course, has recognized exceptions to the warrant requirement, and so have we. Yet, as noted in Terry v. Ohio , the exceptions must be "confined in scope" and "strictly circumscribed." 392 U.S. 1, 25-26, 29, 88 S.Ct. 1868, 1882, 1884, 20 L.Ed.2d 889 (1968). We too have emphasized that exceptions to the warrant requirement, such as the search-incident-to-arrest doctrine, must be "narrowly construed and limited to accommodating only those interests it was created to serve." State v. Gaskins , 866 N.W.2d 1, 8 (Iowa 2015) (quoting State v. McGrane , 733 N.W.2d 671, 677 (Iowa 2007) ).
Justice Jackson famously declared decades ago that the warrant requirement was imposed to ensure that a neutral and detached magistrate made the judgment calls necessary to protect privacy and liberty interests and not an officer "engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States , 333 U.S. 10, 13-14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Yet, the liberty and privacy interests are not less important when the government purpose is beneficial. As noted by Justice Brandeis, "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent." Olmstead v. United States , 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).
Further, no encroachments on liberty are minor. As noted more than a century ago by Justice Bradley, illegitimate practices *260 gain their footing when accepted in their "mildest and least repulsive form." Boyd v. United States , 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886), overruled in part on other grounds by Warden v. Hayden , 387 U.S. 294, 302, 306-07, 87 S.Ct. 1642, 1647-48, 1649-50, 18 L.Ed.2d 782 (1967). And, decisions bending search and seizure restrictions tend to creep-yesterday's close case becomes tomorrow's norm. See State v. Pinkard , 327 Wis.2d 346, 785 N.W.2d 592, 609 (2010) (Bradley, J., dissenting).
II. United States Supreme Court Cases Regarding the Community Caretaking Exception to the Warrant Requirement.
In 1973, a divided United States Supreme Court decided Cady v. Dombrowski , 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), a case often identified as embracing a community caretaking exception to the warrant requirement of the Fourth Amendment. In Cady , a police officer, after consuming alcohol, drove his car into a guardrail and crashed into a bridge abutment. Id. at 435-36, 93 S.Ct. at 2525. At the scene, authorities briefly searched his vehicle for his service revolver, but the weapon was not found. Id. at 436, 93 S.Ct. at 2525. The officer was taken to a local police station and charged with drunken driving. Id. His automobile was towed to a private garage where it was left unguarded outside the premises. Id.
Law enforcement more thoroughly searched the police officer's seized automobile at the private garage in an effort to find the service revolver, which according to testimony at the hearing on the motion to suppress, was "standard procedure in [the police] department." Id. at 437, 93 S.Ct. at 2526. During the more exhaustive search, police uncovered incriminating evidence including a flashlight with spots of blood from between the two front seats of the vehicle, a bloody car mat, and bloody clothing in the trunk of the vehicle. Id. The question before the Cady Court was whether the warrantless search of the automobile passed constitutional muster under the Fourth Amendment. Id. at 442, 93 S.Ct. at 2528-29.
The Cady majority concluded that it did. Id. at 448, 93 S.Ct. at 2531. The majority emphasized a number of features of the case in arriving at its conclusion. First, the Court emphasized that a line of cases already established an exemption from the warrant requirement for automobiles. Id. at 439-40, 93 S.Ct. at 2527. Second, the majority noted that state officials, in light of their local regulatory functions, have much more contact with vehicles than do most federal law enforcement officers. Id. at 441, 93 S.Ct. at 2528. Third, the Court noted that the police already had exercised a form of custody and control over the vehicle by towing it from the scene to a private garage. Id. at 442-43, 93 S.Ct. at 2529. Fourth, the majority noted that the search of the trunk of the vehicle was pursuant to a "standard procedure" in the local police department. Id. at 443, 93 S.Ct. at 2529.
Under the circumstances, the Cady majority concluded that
the type of caretaking "search" conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained.
Id. at 447-48, 93 S. Ct. at 2531. Further, the Court observed that the trunk of the automobile "was vulnerable to intrusion by vandals" and was "reasonably believed to contain a gun." Id. at 448, 93 S.Ct. at 2531.
Despite the narrow language, the Supreme Court also used the term "community *261 caretaking," a potentially protean phrase, to describe police activities not associated with the detection and investigation of crime. Id. at 441, 93 S.Ct. at 2528. Specifically, the Cady majority observed,
Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.
Id.
The above sentence from the Cady majority is, of course, completely true. The interpretive question, however, as will be seen below, is whether this language was intended to provide a springboard for a stand-alone community caretaking exception to the warrant requirement that extends far beyond the limitations expressly emphasized in the majority opinion of Cady .
Justice Brennan, joined by Justices Douglas, Stewart, and Marshall, dissented. Id. at 450, 93 S.Ct. at 2532 (Brennan, J., dissenting). Justice Brennan noted that none of the established exceptions to the warrant requirement applied under the facts of the case. Id. at 451-53, 93 S.Ct. at 2533-34. According to Justice Brennan, the search was not pursuant to the automobile exception because the vehicle was in the custody of the police, was not a search incident to arrest or a seizure of evidence in plain view, was not a search pursuant to a forfeiture proceeding, and did not arise from exigent circumstances. Id. at 451-54, 93 S.Ct. at 2533-34. Justice Brennan thus found the majority had engaged in a serious departure from established Fourth Amendment principles. Id. at 454, 93 S.Ct. at 2534.
The Cady decision itself is an inventory search case and directly led to further inventory search cases in the United States Supreme Court. See Colorado v. Bertine , 479 U.S. 367, 371-72, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) ; Opperman , 428 U.S. at 374-76, 96 S.Ct. at 3099-3100 (majority opinion). These cases make no mention of a broad, stand-alone community caretaking exception to the warrant requirement. Since Opperman and Bertine , the Supreme Court has not provided further guidance on the issue of the community caretaking exception to the warrant requirement of the Fourth Amendment.
A fighting issue in the lower courts has been the extent to which the community caretaking exception in Cady is limited by the case's facts. Is the exception limited to searches of impounded automobiles such as those involved in Cady , Opperman , and Bertine ? Does it extend to other kinds of searches involving automobiles that do not involve impoundment or inventory searches? Does it extend into searches of residences?
A second fighting issue is the standard to be employed in determining whether a warrantless community caretaking search is lawful. While the Cady majority refers to "reasonableness" as a test of evaluating the lawfulness of law enforcement actions, what exactly does that mean? 413 U.S. at 439, 93 S.Ct. at 2527 (majority opinion). Finally, the Cady majority emphasizes that the search was "totally divorced" from criminal investigation or prosecution. Id. at 441, 93 S.Ct. at 2528. How does a court enforce the totally divorced requirement?
In the more than forty years since Cady , the United States Supreme Court has not addressed these issues, and as a result, the development of the community caretaking doctrine has been left to the lower courts.
*262 The only authoritative declaration from the Supreme Court has been the Cady decision, which permitted a warrantless search for community caretaking purposes under the limited circumstances described in that case.
In considering the scope and standards under the community caretaking exception, it is important not to conflate community caretaking with other recognized exceptions to the warrant requirement. For example, warrantless searches have been permitted when there are exigent circumstances or to render emergency aid. See Mincey v. Arizona , 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) ; Michigan v. Tyler , 436 U.S. 499, 509, 98 S.Ct. 1942, 1949-50, 56 L.Ed.2d 486 (1978). Many community caretaking searches fall within these well-established exceptions and do not require a stand-alone community caretaking doctrine. Further, many community caretaking activities of law enforcement arise from consensual encounters that do not implicate constitutional search and seizure protections. A court's refusal to adopt an expansive, stand-alone community caretaking doctrine does not mean that police are prohibited from engaging in community caretaking, but only that if evidence is discovered without a warrant through community caretaking activities, it will be suppressed unless it is admissible under another recognized search and seizure concept.
III. Development of Community Caretaking in Lower Federal Courts.
In light of the limited guidance from the Cady majority and the vigorous nature of the dissent, it is hardly surprising that the lower federal courts have been divided with respect to the application of the community caretaking exception to the warrant requirement outside the context of a Cady search of an impounded automobile. For the most part, however, the federal cases do not involve searches of automobiles, which ordinarily arise in state court proceedings. Yet, the federal cases illustrate some of the fundamental issues involved in considering the scope and standards that inhere in warrantless searches pursuant to a community caretaking function.
For example, several circuits have refused to extend the community caretaking exception. These cases rely on the limiting language in Cady and the availability of other well-recognized exceptions to the warrant requirement. See, e.g. , United States v. Bute , 43 F.3d 531, 535 (10th Cir. 1994) (rejecting community caretaking outside of automobile searches); United States v. Erickson , 991 F.2d 529, 533 (9th Cir. 1993) (holding exigent-circumstances exception adequately accommodates need for warrantless home entry); United States v. Pichany , 687 F.2d 204, 208-09 (7th Cir. 1982) (per curiam) ("[T]he Supreme Court did not intend to create a broad exception to the ... warrant requirement to apply whenever the police are acting in an 'investigative,' rather than a 'criminal' function."). On the other hand, the United States Court of Appeals for the Eighth Circuit has broken free from the limiting language and factual scenario in Cady and found that the community caretaking doctrine applies to searches of homes. See United States v. Quezada , 448 F.3d 1005, 1007 (8th Cir. 2006) ; cf. Ray v. Twp. of Warren , 626 F.3d 170, 177 (3d Cir. 2010) (holding, in the context of qualified immunity, that searching the home under community caretaking did not violate clearly established law); Phillips v. Peddle , 7 F. App'x 175, 179-80 (4th Cir. 2001) (same). The Sixth Circuit swings from seemingly endorsing the extension to homes to seemingly limiting the doctrine to automobiles. Compare *263 United States v. Williams , 354 F.3d 497, 508 (6th Cir. 2003) ("[W]e doubt that community caretaking will generally justify warrantless entries into private homes."), with United States v. Rohrig , 98 F.3d 1506, 1521-22 (6th Cir. 1996) (allowing entry into a home in the middle of the night to turn down loud music disturbing neighbors).
Another question percolating through the federal courts is whether the community caretaking exception extends beyond emergency situations and inventory searches to a third amorphous category of police officers acting as public servants. Arguably, everything an officer does pursuant to his or her lawful duties is acting as a public servant. As a result, a case can be made that the public-servant exception to the warrant requirement would swallow up constitutional restrictions on warrantless searches all together. Some federal courts have seemingly limited the scope of the community caretaking doctrine by adopting the relatively stringent standards generally applicable to a warrantless search based on emergency aid. See United States v. Stafford , 416 F.3d 1068, 1073-75 (9th Cir. 2005) ; Martin v. City of Oceanside , 360 F.3d 1078, 1081-83 (9th Cir. 2004) ; see also Michael R. Dimino Sr., Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness , 66 Wash. & Lee L. Rev. 1485, 1503-04, 1504 n.90 (2009) [hereinafter Dimino].
Once the scope of permissible community caretaking has been established, the next question is what standards the court should apply in determining the validity of the warrantless search. One federal court has, like Cady itself, simply declared that the ultimate inquiry is whether the officer acted "within the realm of reason." Lockhart-Bembery v. Sauro , 498 F.3d 69, 75 (1st Cir. 2007) (quoting United States v. Rodriguez-Morales , 929 F.2d 780, 786 (1st Cir. 1991) ); see Cady , 413 U.S. at 439, 93 S.Ct. at 2527. To simply declare that the search must be "reasonable" is to have no standard at all that judges can consistently and uniformly apply. See Dimino, 66 Wash. & Lee L. Rev. at 1499.
A more structured approach to reasonableness in the context of community caretaking is found in United States v. Garner , 416 F.3d 1208 (10th Cir. 2005). In Garner , the Tenth Circuit fashioned a three-part test for community caretaking, namely, whether "(1) there are specific and articulable facts reasonably warranting the action; (2) the government's interest outweighs the individual's interest in being free of the seizure; and (3) the scope of the detention is no more severe than necessary for its purpose." Dimino, 66 Wash. & Lee L. Rev. at 1501 ; see Garner , 416 F.3d at 1213. The second step of the Garner formulation is not without its problems, however, because if the government's purpose in executing the search is to assist the individual, there is no government interest to be balanced under step two: the only interest involved is, in fact, the interest of the individual being searched. See Dimino, 66 Wash. & Lee L. Rev. at 1502.
IV. Development of Community Caretaking in State Courts.
Like the federal courts, the state courts are divided on the scope and standards of the community caretaking exception. As in federal court, the struggle over the scope of the community caretaking doctrine has surfaced on the question of whether it extends to home searches.
For example, in State v. Vargas , the New Jersey Supreme Court considered whether evidence obtained pursuant to a warrantless welfare check was admissible. 213 N.J. 301, 63 A.3d 175, 177 (2013). The Vargas court noted that although Cady was sometimes cited as a source of a *264 stand-alone community caretaking exception to the warrant requirement, "[a] careful reading of Cady ... raises the question of whether the United States Supreme Court intended to create a new stand-alone warrant exception." Id. at 182. In order to understand whether the development of the community caretaking doctrine "has become untethered from its initial moorings," the court examined the language in Cady . Id. at 182-83. The Vargas court noted that while "the Supreme Court in Cady recognized law enforcement's 'community caretaking functions,' it never suggested that community-caretaking responsibilities constituted a wholly new exception to the warrant requirement that would justify the warrantless search of a home." Id. at 183. The Vargas court noted that Cady , as well as Opperman and Bertine , never intended "community caretaking as an exception to the warrant requirement" and that "[a]ll three cases involved permissible inventory searches." Id. at 184.
In the end, the Vargas court concluded that a broad community caretaking doctrine could not support a warrantless search of a home. Id. at 187. The court emphasized the limited scope of Cady and the availability of other exceptions to the warrant requirement, including the emergency-aid and exigent-circumstances exceptions. Id. at 188-89 ; see also State v. Wilson , 237 Ariz. 296, 350 P.3d 800, 804-05 (2015) (rejecting community caretaking in homes, emphasizing Cady was limited to automobiles); Vargas , 63 A.3d at 187 (holding community caretaking doctrine does not permit warrantless entry or search of home absent exigent circumstances); State v. Ryon , 137 N.M. 174, 108 P.3d 1032, 1043 (2005) (declining to apply community caretaking to a home search, noting that such a search must meet the requirements of the emergency-aid exception).
Other state courts, however, have expanded the scope of community caretaking beyond Cady to apply it to searches of homes as well, at least under some circumstances. See People v. Ray , 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 934 (1999) (articulating a broad community caretaking exception); State v. Alexander , 124 Md.App. 258, 721 A.2d 275, 284-85 (1998) (finding home search permitted under community caretaking exception); see also Commonwealth v. Waters , 20 Va.App. 285, 456 S.E.2d 527, 529-30 (1995) (holding community caretaking could apply to seizure of individual). These cases tend to emphasize the broad nature of community caretaking responsibilities of law enforcement rather than the limiting language in Cady .
The Oregon Supreme Court, on the other hand, does not recognize the community caretaking exception under the Oregon Constitution. State v. Bridewell , 306 Or. 231, 759 P.2d 1054, 1059 (1988) (en banc). Whenever a police officer is engaged in community caretaking functions, the officer must still comply with constitutional standards, including that any search and seizure must be reasonable. Id. The Court of Appeals of Oregon explained that while the community caretaking exception is not recognized under Oregon law, an "analogous" exception exists, namely, the emergency-aid doctrine. State v. Christenson , 181 Or.App. 345, 45 P.3d 511, 514 (2002). Yet, under this exception the police officer must have an objectively reasonable belief that a true emergency exists, which is a demanding standard. Id. Oregon courts also recognize an exigent-circumstances exception. State v. Snow , 337 Or. 219, 94 P.3d 872, 874 (2004) (en banc). Clearly, Oregon courts feel that police officers are able to adequately assist the citizens of their state with only the emergency-aid and exigent-circumstances exceptions.
*265 V. Development of Community Caretaking in Iowa Supreme Court Precedents.
We have considered community caretaking in a number of cases. Like many other courts, however, our handling of this search and seizure doctrine has not always been precise.
For example, in State v. Kersh , we considered the admissibility of evidence-namely a pistol-obtained pursuant to a search of an automobile and driver after police received a report that the vehicle had been driven up onto the lawn, the driver was slumped over the wheel when police arrived, and the driver did not respond to police knocks on the window. 313 N.W.2d 566, 567 (Iowa 1981), overruled in part on other grounds by State v. Lake , 476 N.W.2d 55, 56-57 (Iowa 1991). Police investigated but did not seize the vehicle. Id. at 568.
In Kersh , we noted that the warrantless search would be unlawful "unless it fell within one of the carefully prescribed exceptions." Id. We stated that the search fell within two exceptions to the warrant requirement, which we did not label. Id. We cited Mincey , however, and other cases involving the emergency-aid exception. Id. We also later suggested that there was reason to believe that the driver was intoxicated. Id. We did not, however, expressly discuss the community caretaking doctrine. Although police in Kersh may have been engaged in community caretaking, the case itself does not involve application of a stand-alone community caretaking exception to the warrant requirement but instead provides a conventional application of well-established exceptions to the warrant requirement. The Kersh case does not expressly state whether the challenge was brought under the Fourth Amendment, article I, section 8 of the Iowa Constitution, or both.
A decade later, we decided State v. Mitchell , 498 N.W.2d 691 (Iowa 1993). In Mitchell , the defendant brought a Fourth Amendment challenge to a vehicle search. Id. at 693. In this case, unlike in Kersh , police stopped the vehicle. Id. at 692. The police made the stop because one of the rear taillights was out. Id. Although the applicable criminal statute required only that the vehicle be equipped with "a lighted rear lamp," the driver was subject to a "fix-it memorandum" under rules adopted by the Iowa Department of Public Safety. Id. at 693. The stop in this case was thus a result of an ongoing rule violation. Id. at 693-94. Generally citing Cady , we stated that the duties of officers extend beyond crime detection and include public-safety functions. Id . Yet, the fact that officers' duties are broad does not mean that a stand-alone community caretaking exception to the warrant requirement exists that provides for warrantless searches beyond situations involving exigent circumstances, emergency aid, or consensual encounters. No Iowa constitutional issue was raised in Mitchell .
The next case is State v. Carlson , 548 N.W.2d 138 (Iowa 1996). The Carlson case involved a warrantless, nighttime raid of a residence. Id. at 139. As in Kersh , we found in Carlson that police were acting lawfully under the exigent-circumstances and emergency-aid exceptions to the warrant requirement. Id. at 143. Blended into the discussion is dicta about the community caretaking function, but the thrust of the case is that the warrantless search was lawful under traditional exceptions to the warrant requirement. Id. at 141 & n.3. Carlson is thus a case where the court "declare[s] that the community caretaker exception applies, but then use[s] law applicable to one of the other exceptions, such as the emergency doctrine." See *266 State v. Deneui , 775 N.W.2d 221, 232 (S.D. 2009). The challenge in Carlson was brought under both the Fourth Amendment and article I, section 8, but no effort was made to distinguish Iowa constitutional law from prevailing federal precedent. 548 N.W.2d at 140.
After Carlson , we decided State v. Moore , 609 N.W.2d 502 (Iowa 2000) (en banc). In Moore , a park ranger stopped a vehicle to warn the driver that his speed posed a danger to campers parked in the area. Id. at 503. When the vehicle was stopped, the park ranger smelled alcohol and notified the Iowa state patrol, leading to the driver's arrest for operating a vehicle while intoxicated. Id. The driver sought to suppress evidence arising from the stop. Id. The district court denied the motion to suppress. Id.
On appeal, we affirmed the district court. Id. We noted specifically the circumstances in the park where there was a full campground with numerous families, individuals, and no sidewalks. Id. at 503-04. Further, the evidence showed that parked vehicles along the campsites obstructed the view of campers entering the roadway and obstructed the view that motorists would have of campers who might step out onto the road. Id. at 503. Under the peculiar facts and circumstances, we held that the stop was a valid public-safety function. Id. at 504. Moore solely involved a challenge under the Fourth Amendment. See id. Additionally, it is a third-party assistance case, where the police intervention with respect to the vehicle driver was designed to protect others and not the driver. See id. at 503-04.
In 2003, we decided State v. Crawford , a Fourth Amendment case. 659 N.W.2d 537, 539 (Iowa 2003). In Crawford , a call was received by a police dispatcher in the early morning hours that a person in the caller's apartment "had taken some pills" and was "physically aggressive towards [her] and was yelling and shouting." Id. at 539-40 (alteration in original). A second call revealed that the individual had left the apartment in a flatbed truck. Id. at 540. Police encountered the truck on the way to the apartment and activated their overhead lights, and the truck pulled over to the side of the road. Id. Crawford, the driver of the truck, disobeyed the command to remain in the vehicle and ultimately went to the patrol car. Id. At the patrol car, the police detected an odor of alcohol, obtained admissions from Crawford, and administered a preliminary breath test, the results of which showed intoxication above the legal limit. Id.
For the first time, we canvassed the community caretaking doctrine in some detail. Id. at 541-43. We noted that warrantless searches are per se unreasonable, "[s]ubject to a few carefully drawn exceptions." Id. at 541. In discussing community caretaking, we cited a commentary that noted "the community caretaking exception encompasses three separate doctrines: (1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception noted in Cady ." Id. ; see Mary Elisabeth Naumann, Note, The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception , 26 Am. J. Crim. L. 325, 330-41 (1999). Aside from the commentary, we cited no caselaw for the proposition that community caretaking involves an amorphous public-servant prong. See Crawford , 659 N.W.2d at 541. We then broadly stated, somewhat inaccurately, that we had applied the community caretaking doctrine in Moore , Carlson , Mitchell , and Kersh . Id. at 542. Moore , Carlson , and Kersh involved emergency or exigent circumstances, while Mitchell involved an ongoing infraction of the law.
In Crawford , we stated that in community caretaking cases, the reasonableness of *267 the warrantless search is based on the facts and circumstances of the case, that reasonableness is determined by balancing the public need against the nature of the intrusion on the privacy of the individual, and that pursuant to the balancing requirement, "the state has the burden of 'showing specific and articulable facts that indicate their actions were proper.' " Id. at 542 (quoting Carlson , 548 N.W.2d at 142 ). We then proceeded to embrace a three-pronged test for community caretaking as articulated by a Wisconsin appellate court in State v. Anderson . Id. at 543 (citing State v. Anderson , 142 Wis.2d 162, 417 N.W.2d 411, 414 (Wis. Ct. App. 1987) ). Under the three-pronged Anderson test, a court considering the validity of a warrantless search under the community caretaking exception asks
(1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?
Id.
In applying the Anderson test, the Crawford court found that there was a seizure. Id. The Crawford court then stated that the second step of the analysis rested on "whether the facts available to the officer at the moment of the seizure would have warranted a reasonable person to believe an emergency existed." Id. (emphasis added). As to this step, we noted that police had received a report of a male subject taking some pills, being physically aggressive, being confused and not knowing where he was, and leaving in a flatbed truck. Id. We concluded that this was sufficient for the officer to take the action he did "in the interest of public safety and emergency aid ." Id. (emphasis added). We then briefly turned to the balancing test and stated that the need and interest in determining the condition of a person taking pills and acting oddly was sufficient to outweigh the minimal intrusion of the defendant driver's rights. Id. Although the case nominally involved community caretaking, the language of Crawford emphasizes the emergency-aid doctrine as providing the exception to the warrant requirement.
We came to a different conclusion in a challenge to a warrantless search under article I, section 8 of the Iowa Constitution in State v. Tague , 676 N.W.2d 197, 206 (Iowa 2004). In Tague , an officer followed a vehicle for about a mile at about 2:00 a.m. and observed the vehicle cross over the left edge of the roadway. Id. at 200. At this point, the officer activated his emergency lights and pulled the vehicle over. Id. Once pulled over, the officer approached the vehicle, detected the odor of alcohol, and observed the driver's bloodshot eyes and a slight slur to his speech. Id. After conducting a field sobriety test, the driver was arrested for operating under the influence. Id.
In Tague , the state defended the stop on the ground there was reason to believe that the driver was either intoxicated or fatigued. Id. at 204. After canvassing the record for particular and articulable facts to support the stop, we concluded that an isolated incident of briefly crossing the edge line does not give rise to suspicion of either intoxication or fatigue. Id. at 205-06. We noted,
Drivers talking on their cell phone, looking at a map, adjusting the radio, adjusting the heater, defroster or air conditioner, or checking on a child restrained in the back seat can lead a driver to momentarily cross an edge line, without giving rise to a reasonable suspicion of intoxication or fatigue.
Id. at 205.
Our most recent community caretaking case is State v. Kurth , where the defendant *268 challenged a warrantless search of his automobile under the Fourth Amendment. 813 N.W.2d 270, 271 (Iowa 2012). In Kurth , an officer activated his emergency lights and blocked in a driver in a parking lot based on the officer's belief that the vehicle had struck an object in the roadway and suffered minor damage not affecting the drivability of the car. Id. at 271-72. We outlined the Cady opinion, citing a commentator who noted that the case provided "little doctrinal guidance from the Supreme Court other than the vague command of reasonableness." Id. at 273 (quoting Dimino, 66 Wash. & Lee L. Rev. at 1490 ).
In sum, our cases have been inconsistent. In Kurth , Carlson , and Crawford , the searches involved community caretaking but were analyzed under the emergency-aid or exigent-circumstance exceptions to the warrant requirement. In Moore , although the officer was engaged in community caretaking, traditional emergency-aid or exigent-circumstances doctrines could have supported the officer's actions. Finally, in Tague and Kurth , we refused to apply a broad, stand-alone community caretaking doctrine under the facts and circumstances of the case. In no case have we affirmatively stated that the community-caretaking doctrine, whatever it includes, is broad enough to cover situations where law enforcement is providing assistance to the driver of a vehicle-first-party assistance-nor have we considered the requirements that the state must show for a warrantless first-party assistance search to meet constitutional standards.
VI. Survey of State and Federal Cases Involving First-Party Assistance Searches and Seizures of Stopped Vehicles and Motorists Under the Community Caretaking Exception.
We now turn to cases involving warrantless first-party assistance searches and seizures of vehicles on the side of the road. Given the doctrinal uncertainty surrounding community caretaking, it comes as no surprise that the caselaw related to warrantless searches and seizures of such vehicles is scattered. It is no doubt true that the results in the cases turn on the totality of the facts and circumstances, and as a result, the precedents may not provide a basis for rigid reliance. Yet, a survey of the cases can help inform our analysis of the present controversy.
A substantial number of cases involving first-party assistance seizures of stopped vehicles have required specific, articulable facts demonstrating a reasonable belief that the driver or passengers were in need of assistance. These cases often emphasize that when there are only generalized concerns, law enforcement may utilize less intrusive means to determine whether there is a need of assistance but may not engage in warrantless seizures.
An illustrative case is Commonwealth v. Livingstone , 174 A.3d 609 (Pa. 2017). In Livingstone , police encountered a vehicle parked on the side of the road at 9:30 p.m. Id. at 614. The hazard lights of the vehicle, however, were not activated. Id. The Livingstone court determined that if there was a public-servant prong to community caretaking, there must be a means that "will cabin reliance on the exception and enable courts to properly assess its employment." Id. at 635. The court determined that in order to apply the public-servant prong of community caretaking to a parked vehicle, the officer "must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance." Id. at 634. As in Tague , the Livingstone court noted that there are many possibilities that could *269 cause a vehicle to be on the side of the road, namely, to look at a map, make telephone calls, send text messages, or pick something up off the floor. Id. at 634-35. The court held the seizure invalid and suppressed resulting evidence obtained from it. Id. at 638.
State v. Boutin is a similar case. 161 N.H. 139, 13 A.3d 334 (2010). Here, a vehicle was on the "pull off" of a road at 8:35 p.m. on a dark, cold night with snow on the ground. Id. at 335. A police officer seized the vehicle in order to make sure everyone was "okay." Id. at 337. According to the Boutin court, however, there were no specific and articulable facts to justify the intrusion. Id. The court observed that the vehicle was parked legally and there were no "signs of an accident, that the car was disabled, or that the passengers were in any type of distress." Id. The court stated that the officer had "generalized concerns" but the officer "did not describe any specific and articulable facts that justified the intrusion." Id. The officer's actions, according to the court, amounted to nothing more than a hunch. Id. The court further noted that a seizure of the vehicle and its occupants was not necessary as the officer could have activated his rear-facing lights and could have used a spotlight to illuminate the parked vehicle if necessary. Id. at 338 ; see also State v. Schmidt , 137 Idaho 301, 47 P.3d 1271, 1274 (Idaho Ct. App. 2002) (holding detention of vehicle pulled off the road not reasonable under community caretaking).
A third case of interest is Ozhuwan v. State , 786 P.2d 918 (Alaska Ct. App. 1990). Here, an officer encountered two cars parked at night in an area near a boat launch in a campground, a place where teenagers were known to congregate to drink. Id. at 920. The officer activated his emergency lights, thereby seizing the vehicles and their occupants. Id. at 921. The Ozhuwan court concluded that a general awareness that the campground was used at night as a place for minors to drink was insufficient to support the search and seizure. Id. at 921-22. The court emphasized that there was no actual indication of any problem and that no request for assistance had been received. Id. at 922. While the court noted that generalized concerns for safety could certainly have justified a contact in a nonintrusive manner, the generalized concerns did not support a seizure. Id.
A fourth case illustrating the limits of community caretaking in a first-party assistance case is State v. Button , 195 Vt. 65, 86 A.3d 1001 (2013). Here, shortly before midnight, the defendant pulled to the side of the road and stopped with his engine running and lights on. Id. at 1002. According to the Button court, the vehicle did not pose a traffic hazard. Id. at 1005. The court held the seizure unlawful. Id. at 1006. The court noted that had the "defendant indicated that he needed help, or parked in a precarious location," the result might be different. Id. Yet, under the circumstances, the court reasoned that the officer could have slowly driven by the defendant's car while looking through the window to determine whether the driver needed help. Id.
Two cases out of Montana show the privacy interests that people have in their automobiles when parked at night. In State v. Hoover and State v. Graham , adults engaging in consensual intimacy in their parked cars were seized by law enforcement officers. Hoover , 388 Mont. 533, 402 P.3d 1224, 1227-28 (2017) ; Graham , 340 Mont. 366, 175 P.3d 885, 887 (2007). In both cases, the locations of the parked vehicles were somewhat unusual. Hoover , 402 P.3d at 1227 (involving a vehicle parked in between two storage units at automobile dealership lot); Graham , 175 P.3d at 887 (stating police officer observed *270 vehicle "parked on a dirt pullout within plain sight of the road"). There were no specific and articulable facts, however, that suggested the persons in the vehicles were in need of assistance. Hoover , 402 P.3d at 1235 ; Graham , 175 P.3d at 891. Any undeveloped, generalized suspicions were insufficient to support the seizures and subsequent searches. Hoover , 402 P.3d at 1235 ; Graham , 175 P.3d at 891.
There is one federal case dealing with the seizure of a parked vehicle. In United States v. Gross , a police officer noticed a person slumped down in the front passenger seat of a lawfully parked vehicle. 662 F.3d 393, 396 (6th Cir. 2011). The officer parked his car directly behind the vehicle, blocking it in, and turned on his vehicle spotlight. Id. at 396. The officer then approached the passenger side door and asked the passenger for identification. Id. at 397. The officer ran a warrant check, discovered an outstanding warrant, and arrested the passenger. Id.
The Sixth Circuit rejected the claim that the seizure was permissible under the community caretaking doctrine. Id. at 400. The Gross court emphasized that there was no indication that community caretaking was needed. Id. at 400-01. Further, the Gross court emphasized any legitimate caretaking "could have been accomplished through a consensual encounter rather than" by blocking in the vehicle and investigating the occupant. Id. at 401.
There are, however, first-party assistance cases involving parked vehicles where seizures under the public-servant prong of community caretaking have been upheld. These cases, however, often emphasize specific and particular facts related to the need for first-party assistance to support the seizure.
For example, there are a number of first-party assistance cases involving parked vehicles sustaining community caretaking seizures in what might be called slumped-driver cases. See, e.g. , In re Suspension of Driver's License of Clayton , 113 Idaho 817, 748 P.2d 401, 402-03 (1988) ; Kozak v. Comm'r of Pub. Safety , 359 N.W.2d 625, 627, 628 (Minn. Ct. App. 1984) ; State v. Lovegren , 310 Mont. 358, 51 P.3d 471, 472, 474, 476 (2002). In these cases, an officer observes a driver slumped over the wheel of a parked car before a seizure is made. Knowledge of the presence of a slumped driver provides sufficient particularized concern to justify a seizure of the vehicle and subsequent search.
A second category of first-party assistance cases involving parked vehicles are cases where assistance is impliedly invited. See, e.g. , People v. McDonough , 239 Ill.2d 260, 346 Ill.Dec. 496, 940 N.E.2d 1100, 1103, 1110 (2010) ; State v. Anderson , 362 P.3d 1232, 1234, 1240 (Utah 2015) ; State v. Kramer , 315 Wis.2d 414, 759 N.W.2d 598, 601, 610 (2009). For instance, in cases where the parked vehicle has flashing emergency or hazard lights, seizures have been found lawful and the evidence arising from them has not been suppressed.
A third category of first-party assistance cases involving parked vehicles arises where odd circumstances surround the parked vehicle. For instance, in State v. McCormick , the defendant's vehicle was parked kittywampus across the entryway of a closed grocery store, with seventy-five percent of the entryway blocked, and a left wheel protruding onto the public roadway at around 2:45 a.m. 494 S.W.3d 673, 676 (Tenn. 2016). The officer activated his rear lights and found the driver slumped over the wheel. Id. The McCormick court found sufficient particularized facts to support the actions of law enforcement. Id. at 688-89.
*271 In general, though the results in the first-party assistance cases involving stopped vehicles are somewhat mixed, the caselaw embraces a concern that the public-servant prong of community caretaking must be carefully cabined through a particularized showing that the driver or occupants are likely to desire or consent to assistance by law enforcement. See, e.g. , Boutin , 13 A.3d at 336 (stressing warrantless seizures must fall "within the narrow confines of a judicially crafted exception"); State v. Diloreto , 180 N.J. 264, 850 A.2d 1226, 1237 (2004) ("The community caretaker doctrine remains a narrow exception to the warrant requirement."); Livingstone , 174 A.3d at 635 (requiring officer to articulate specific and objective facts to "cabin reliance on the exception and enable courts to properly assess its employment"); McCormick , 494 S.W.3d at 688 ("[C]ourts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse.").
VII. Analysis.
I begin by considering the lesser claim advanced by Coffman, namely, that even assuming the validity of a public-servant prong of community caretaking, the seizure in this case was unlawful. In considering the validity of a warrantless search and seizure, the burden of rebutting a presumption of unlawfulness rests with the government. State v. Horton , 625 N.W.2d 362, 368 (Iowa 2001) (en banc) (Snell, J., dissenting); State v. Moriarty , 566 N.W.2d 866, 868 (Iowa 1997).
The first question under Crawford is whether there was a seizure. 659 N.W.2d at 543. The State does not contest that a seizure occurred when the officer in this case activated his overhead emergency lights. There is ample authority for the proposition that a seizure occurs when a police officer activates emergency lights and pulls behind a parked vehicle. See, e.g. , Livingstone , 174 A.3d at 621-25 ; Anderson , 362 P.3d at 1237. But see Kramer , 759 N.W.2d at 606 (assuming without deciding that driver was seized).
The second question is whether the police officer was engaging in a bona fide community caretaking activity. Crawford , 659 N.W.2d at 543. In order to support the seizure in this case as a bona fide community caretaking activity, under the better-reasoned cases, there must be specific, peculiar, and articulable facts to support the notion that the occupants of the vehicle consented to receiving assistance. See Schmidt , 47 P.3d at 1274 ; McDonough , 346 Ill.Dec. 496, 940 N.E.2d at 1109. We said as much in Crawford , where we stated that "specific and articulable facts" were required to support the warrantless seizure. 659 N.W.2d at 542-43.
The requirement of specific, peculiar, and articulable facts is critical to any community caretaking analysis. Even the cases that embrace the public-servant prong of community caretaking emphasize the need for providing effective limits to prevent abuse. See Livingstone , 174 A.3d at 637 ; McCormick , 494 S.W.3d at 688. Without clear controls, the public-servant prong could swallow search and seizure protections. Ray , 88 Cal.Rptr.2d 1, 981 P.2d at 941 (Mosk, J., dissenting). If there is to be a public-servant aspect of the community caretaking exception, it must be carefully controlled.
Here, the State did not meet its burden of showing specific, particularized reasons for the seizure. At best, the police officer may have had a generalized concern about the situation of the occupants in the vehicle. In Tague , we emphasized that there are many reasons why a person might swerve once over the line on the left side of the road. 676 N.W.2d at 205. Similarly, the caselaw demonstrates that there are *272 all kinds of reasons why a person might pull off the road. See Livingstone , 174 A.3d at 634-35 (listing reasons).
It is also important to note what was absent here. There was no slumped driver, no activation of hazard lights, no objective indices of a request for help, no oddball parking, and no safety hazard. As the above discussion indicates, many of the cases supporting seizures of parked vehicles rely upon these types of particularized facts. See, e.g. , Clayton , 748 P.2d at 402 (involving a slumped driver); McCormick , 494 S.W.3d at 688 (involving vehicle parked kittywampus blocking entrance to grocery store late at night and driver slumped over); Kramer , 759 N.W.2d at 610 (holding search constitutional when driver's hazard lights were activated).
And, there was no reason why a consensual encounter, rather than a seizure, would not have been sufficient to satisfy any community caretaking interest. "[T]he multitudinous everyday contacts between police officers and individuals do not approach any need for forcible intrusions on privacy." Commonwealth v. Canavan , 40 Mass.App.Ct. 642, 667 N.E.2d 264, 267 (1996). A number of parked-vehicle cases persuasively stand for the proposition that interventions less than seizures are adequate to vindicate any community caretaking function. Gross , 662 F.3d at 401 ; Ozhuwan , 786 P.2d at 922 ; Boutin , 13 A.3d at 337-38 ; Button , 86 A.3d at 1002.
It is true, of course, that the incident occurred at night. This is, at best, a double-edged sword. As police found in Hoover , 402 P.3d at 1227, and Graham , 175 P.3d at 887, night time parked vehicles may be used for consensual intimate encounters. To paraphrase the New Hampshire Supreme Court, if we were to accept this argument, we would be rendering the constitutional protection dependent on the time of day. Cf. Boutin , 13 A.3d at 337 (rejecting role of seasons in validating search).
Further, this case involves a seizure designed to benefit the party seized, or a first-party assistance seizure. When a first-party assistance seizure is involved, there is no government interest beyond that of assisting the individual. See State v. Kinzy , 141 Wash.2d 373, 5 P.3d 668, 681 (2000) (en banc) ("Rendering aid or assistance through a health or safety check is a hallmark of the community caretaking of the function exception."); cf. Kramer , 759 N.W.2d at 611 (stressing the public interest involved is assisting motorists). Such seizures can be justified, not by balancing the interests of the government against the individual, but only on a theory of implied consent that focuses solely on the individual. When the government acts to protect a person, "the only relevant perspective is that of the individual citizen." Ronald J. Bacigal, Choosing Perspectives in Criminal Procedure , 6 Wm. & Mary Bill Rts. J. 677, 728-29 (1998). In this case, there was no reason based on the facts known to the police officer to believe that the occupants of the vehicle desired police assistance.
And, under Iowa law the privacy interest of a party in an automobile is substantial. In State v. Vance , we cited a body of academic writing that seeks to increase privacy protections with respect to automobiles compared to recent United States Supreme Court precedent. 790 N.W.2d 775, 787 (Iowa 2010) ; see Carol A. Chase, Cars, Cops, and Crooks: A Reexamination of Belton and Carroll with an Eye Toward Restoring Fourth Amendment Privacy Protection to Automobiles , 85 Or. L. Rev. 913, 940-41 (2006). In his concurring opinion in State v. Storm , Chief Justice Cady concluded that under the facts presented, a warrantless search of an automobile could be sustained on an exigent- *273 circumstances theory but only because the defendant failed to show that technology made the acquisition of a warrant practical under the circumstances of the case. 898 N.W.2d 140, 157 (Iowa 2017) (Cady, C.J., concurring specially). Notably, the concurring opinion did not emphasize the lessened expectation of privacy in an automobile but only its mobility. See id. Automobiles are used by Iowans for many purposes, which may include taking a snooze, rubbing the neck of a spouse, as here, or other intimate acts.
In light of the above discussion, it is not necessary to address the larger argument that we should decline to adopt a community caretaking exception that includes the public-servant prong. There are, of course, some important reasons supporting such a view. As has been pointed out above, nothing in Cady itself specifically embraces a broadly framed, stand-alone community caretaking exception. Further, rejection of a broadly framed community caretaking exception would have limited impact on law enforcement as many community caretaking encounters are either consensual or supported by the emergency-aid or exigent-circumstances exceptions. In addition, as demonstrated by the review of caselaw, the public-servant prong tends to be highly fact specific, which could lead to lack of clarity in the law and the slicing and dicing of fact patterns with no principled rule of decision. See, e.g ., Graham , 175 P.3d at 891 (characterizing case as a close call); State v. Cryan , 320 N.J.Super. 325, 727 A.2d 93, 95 (1999) (same); Pinkard , 785 N.W.2d at 603 (majority opinion) (same). For those who favor bright-line rules for adjudication and who advocate certainty and predictability in the law, the elimination of the potentially sprawling public-servant prong might be in order. Yet, by tightly cabining the public-servant prong in first-party assistance cases with a requirement of specific and particularized facts related to the question of whether the occupants of the parked vehicle are manifesting any desire for assistance, the potential abuse is at least limited if not eliminated. In any case, it is not necessary for us to address the larger question today.
VIII. Conclusion.
In my view, for the above reasons, the seizure here was invalid under article I, section 8 of the Iowa Constitution. As a result, I respectfully dissent.
Wiggins, J., joins this dissent.